TOM ORSBORN V. DEEP ROCK OIL CORPORATION ET AL

No. A-4335. Decided March 31, 1954.
Rehearing overruled May 26, 1954.
(267 S.W. 2d Series 781)

*Watson & Watson,* of Stamford, *Joe Reeder, Jr.,* of Knox City, *Adkins, Folley, Adkins, McConnell & Hankins* and *A. B. Hankins,* all of Amarillo, for petitioner.

The Court of Civil Appeals erred in holding that grazing alone for the statutory period was not sufficient use to perfect limitation title when all the elements required under the statute are present. Caver v. Liverman, 143 Texas 359, 185 S.W. 2d 417; Taliferro v. Butler, 77 Texas 578, 14 S.W. 191; Burnham v. Hardy Oil Co., 108 Texas 555, 195 S.W. 1139.

*Alexander & Martin,* of Fort Worth, for The Alliance Trust Co., *Brookerson & Brookerson,* of Seymour, for Mrs. C. M. Bowling, and Deep Rock Oil Corp., *Andrews & Andrews,* of Stamford, for Crude Oil Co. and Federal Royalty Co., *Turpin, Kerr & Smith* and *Irby L. Dyer,* all of Midland, for Deep Rock Oil Corp., respondents.

Since petitioner failed to show adverse possession by reason of continuous use or that the land in question was under fence, or other facts sufficient to evidence possession hostile to the real owner, the Court of Civil Appeals was not in error in holding that the use of the land was insufficient to sustain title by limitation. West Production Co. v. Kahanek, 132 Texas 121 S.W. 2d 328; Harmon v. Overton Refining Co., 130 Texas 365, 109 S.W. 2d 457; McKee v. Stewart, 139 Texas 260, 162 S.W. 2d 948.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

Petitioner Tom Orsborn sued C. B. Long and respondents Deep Rock Oil Corporation and others for the title and possession of a tract of land containing 56.85 acres in the J. G. Eustis Survey No. 2 in King County, alleging title by adverse possession under the ten years statute of limitations. C. B. Long, the record owner of the surface and an undivided 2/35 interest in the minerals, filed disclaimer. Respondents, being all of the defendants other than C. B. Long, and being the owners of the record title to the land in controversy except the interests in which Long owned the record title, answered by pleas of not guilty. After trial by the court without a jury, judgment for title and possession was rendered for petitioner against all of the defendants. The Court of Civil Appeals reversed the trial court's judgment and rendered judgment that petitioner take nothing by his suit against respondents. 259 S.W. 2d 625.

The trial court made elaborate findings of fact, some of which seem rather to be conclusions of law, finding in petitioner's favor all of the elements essential to establish title by adverse possession under the ten years statute of limitations, Article 5510, Revised Civil Statutes of 1925, as the same are prescribed by that article and defined in Articles 5514 and 5515.

The Court of Civil Appeals reached the conclusion that according to the undisputed facts in evidence petitioner failed to prove essential elements for the acquisition of title by adverse possession. More particularly, the Court of Civil Appeals decided that the possession of the disputed tract of land by petitioner and his father, who had acquired title to near-by land under recorded deeds, was not possession of such character as of itself gave notice of an adverse, hostile possession that would mature into title at the expiration of the statutory period, in this, that the disputed tract was casually enclosed together with the land owned by petitioner and his father and a tract of land owned by the State, all enclosed by a fence not constructed by petitioner or by his father, and that their cattle only incidentally and occasionally grazed off of the land which they owned onto the disputed tract of land.

After a careful examination of the entire statement of facts we have reached the same ultimate conclusion as that reached by the Court of Civil Appeals. Looking to all of the evidence and accepting as true all of the evidence offered by petitioner, including petitioner's testimony, we find that there is wanting evi-

dence of probative value tending to prove that petitioner and his father or either of them had adverse possession of the disputed tract as defined in Article 5515, that is, "actual and visible appropriation of the land commenced and continued under a claim of right inconsistent with and hostile to the claim of another." The case presents a question or questions of law. There are no conflicts in the evidence as to any material facts. The statement of facts indeed consists almost wholly of evidence offered by petitioner. Respondents offered no evidence except documentary evidence, testimony as to the topography and quality of the land and portions of petitioner's deposition. In order to make plain the basis of the conclusion expressed, it is necessary to make a statement of the substance of the material facts.

In October, 1919, J. T. Orsborn, petitioner's father, acquired by deed from E. C. Couch and W. A. Smith the David Davis Survey, or two tracts of land of that survey, a total of 160 acres, and also the E. M. Ellis Survey, containing 150.5 acres, and lying immediately southwest of the Davis Survey. In December, 1919, J. T. Orsborn acquired by deed from J. A. Wade four tracts of land, a total of 370 acres, of Section 80, H. & T.C. Ry. Co., which adjoins the Davis Survey on the northeast. In November, 1921, J. T. Orsborn acquired by deed from M. T. Holland a tract of land containing 120 acres out of Section 80, H.&T.C. Ry. Co. Each of the deeds described the tracts conveyed by metes and bounds, with references to survey lines and corners, the Brazos River and artificial objects; but the deed contained no reference to a fence or fences. Two of the deed were filed for record on January 30, 1920, and the third deed on December 7, 1921.

Petitioner testified that when his father bought the land in the Ellis and Davis Surveys and in Section 80 there was an existing fence forming an enclosure which is now shown to embrace an area of about 747.58 acres, and that the enclosing fence or fences were then about where they are now; that sometimes parts of the fence were washed out, but that they would be replaced "as soon as we could get to them." The fence forming the enclosure was not built by petitioner's father nor by petitioner, but petitioner testified that it has been maintained in fair repair.

The area of 747.58 acres enclosed by the fence extends northeast and southwest along or near the Brazos River. Its length northeast and southwest is about 4,560 varas, or 2.4 miles. In its northeast part the enclosed area is about 1,350 varas wide, and in its southwest part at about the middle of the disputed tract

the width of the enclosed area is about 585 varas. The land that petitioner's father acquired by deeds is the northeast part, 630.73 acres, of the enclosed 747.58 acres. Immediately southwest of that land is a 60-acre tract owned by the State, and immediately southwest of the State tract and at the southwest end of the enclosed area is the 56.85 acre tract in controversy.

The disputed 56.85 acre tract has not been fenced separately from the other land within the enclosure of 747.58 acres. There is no fence along the northeast line of the disputed tract and the fence on its northwest line is wholly, or almost wholly, on Survey 89, H.&T.C. Ry. Co., to its northwest. The record does not show when, by whom, or for what purpose the fences forming the 747.58 acre enclosure were built.

A witness for petitioner testified that he knew the land within the enclosure as early as 1912 or 1913, and that at that time it was fenced in several tracts and owned by different persons.

There are some differences in the testimony as to the quality of the land in the disputed tract, but there seems to be agreement that the north part of the tract is hilly, with but little grass on it, that much of the land within the tract and near the river is grown up wih salt cedars, and that toward the east and northeast part of the tract there is grass of average quality. It is further shown by the record that the best land for grazing is in the north and northeast parts of the 747.58 acre enclosure. Petitioner testified that there is and was little grass on the west part of the tract in controversy.

Soon after petitioner's father acquired the land in the Davis and Ellis Surveys and in Section 80, H. & T.C. Ry. Co., he began to use the land within the enclosure for grazing cattle, and so used it continuously until he died in 1933. Thereafter petitioner used the land continuously in the same way until about the time this suit was filed. Some small tracts in Section 80 have been farmed but there has never been any cultivation of the disputed tract of land, and no improvements have ever been placed on it except "fix the fence." There are and have been windmills and watering places on the part of Section 80, H.&T.C. Ry. Co., and on the Davis Survey that petitioner's father acquired by deeds, but there have been no windmills or watering places on the disputed tract. The nearest watering place is about a mile from the disputed tract.

Asked about the number of cattle that he and his father grazed on the 747.58 acres enclosed, petitioner testified that they

usually tried to keep "around thirty cattle or something like that." He testified that cattle were scattered all over the enclosure, and when questioned particularly whether he could say definitely "at any given year there were cows on that disputed tract at any certain time," he answered: "I couldn't give any certain months, but I could say that I have seen them there every year; almost every time you went over there you could see them."

Petitioner testified that his father regularly paid his taxes on his land, but that neither he nor his father ever rendered any part of the J. G. Eustis Survey No. 2 (the survey in which the disputed tract lies) for taxes and that they paid no taxes on it. Respondent offered in evidence the rendition made by petitioner for taxes for the year 1952, in which are included the Davis Survey and the Ellis Survey but no part of the J. G. Eustis Survey No. 2, and in which is the affidavit of petitioner that the rendition is a full and complete list of all taxable property owned or held by him in the county. Petitioner's explanation of the failure on his part and on the part of his father to render for taxation or to pay taxes on the disputed tract is that they did not know "this Eustis Survey was in there until I hired this surveyor * * * in the spring of 1951." Respondents introduced in evidence tax receipts showing payment of the taxes on the J. G. Eustis Survey No. 2 by the record owners for several years, including the years from 1931 to 1937 inclusive.

Petitioner testified that when his father bought the land he got a deed to it. And he testified that his father bought "that land over there that was under fence, he was claiming that." Interrogated closely about his statement that his father bought all the land under fence, he answered: "He bought the acreage and you would naturally buy all that was under fence, you would expect to buy all of it." He testified further that he was not present when his father "bought those tracts of land." Petitioner testified several times that his father claimed the land "that he bought," and that he and his father always claimed all the land within the enclosure and claimed the disputed tract, but he did not testify to any assertion of such a claim or to any facts evidencing it, or offer any evidence tending to prove such a claim, unless the existence and maintenance of the fence and the grazing of the land within the enclosure may be taken as evidence of claim.

In about the year 1949 petitioner, his mother and his sisters executed an oil and gas lease on the Ellis Survey, the Davis Sur-

vey, and on their tracts of land in Section 80, H.&T.C. Ry. Co., and also on a 187-acre tract south of the river. The lease covered no part of the J. G. Eustis Survey No. 2, and they thought the lease included all the land that they owned. Petitioner testified that his father during his lifetime borrowed money and gave liens on land as security, but that he never knew of any instance where he executed any instrument that included any part of the J. G. Eustis Survey No. 2.

■ It is settled that limitation title cannot be acquired by grazing unenclosed land. Fuentes v. McDonald, 85 Texas 132, 20 S.W. 43; Vineyard v. Brundrett, 17 Texas Civ. App., 147, 42 S.W. 232, application for writ of error refused; Allison v. Groppenbacher, 142 S.W. 2d 528, application for writ of error refused. And it is of course true that title cannot be acquired merely by fencing land without grazing it or farming it or putting it to other use. When the use relied upon to support the statute is grazing, there must be also at the same time sufficient enclosure, such as to give evidence that the land was designedly enclosed and to show the assertion of claim hostile to the true owner. Vineyard v, Brundrett, 42 S.W. 232, 235. The ordinary case for the acquisition of title by adverse possession, when the use is grazing, is one in which the person claiming title under the statute has built a fence or fences enclosing the land and has maintained the enclosure and continuously used the land for grazing during the statutory period. Such construction of fences and use of the land for grazing afford evidence of hostile claim. Petitioner would bring this case within that general rule.

■ We agree, however, with the decision of the Court of Civil Appeals that the facts of this case take it out of that general rule and bring it under the principle announced and applied in the following cases, that when the disputed tract of land has been casually or incidentally enclosed with other land, especially when, as here, such other land is held by the possessor under deed, the incidental enclosure and the occasional grazing of the disputed tract by cattle straying from the titled land will not amount to such adverse and hostile possession and use as will support the statute of limitations. Harmon v. Overton Refining Company, 130 Texas 365, 109 S.W. 2d 457, 110 S.W. 2d 555; West Production Company v. Kahanek, 132 Texas 153, 121 S.W. 2d 328; McKee v. Stewart, 139 Texas 260, 162 S.W. 2d 948; Primitive Baptist Church v. Fla-Tex Corp., 158 S.W. 2d 549.

Discussion of the facts in those cases and comparison of their facts with those of the case before us would prolong the opinion

unduly. Quotations from two of the cases, with brief comment about the rule of them, should be sufficient to show that they support the conclusion we have expressed.

The opinion in Harmon v. Overton Refining Company, 130 Texas 365, 372, 109 S.W. 2d 457, 110 S.W. 2d 555, contains the following:

"It is well settled that when one enters into possession of land under a deed his possession is referable to the deed, and is presumed to be in conformity with it, and is confined to the limits thereof. Therefore, in order for a vendee to acquire title by adverse possession of additional or adjoining land outside the limits of the boundaries in his conveyance, he must have actual possession of such additional land of such character as of itself will give notice of an exclusive adverse possession and mature into title after the statutory period. * * *

"In this instance there was not such possession. Cohagen went into possession under his deed and every act of visible appropriation and ownership was upon the 9.29 acres, and was referable to his deed. The tract in controversy was not fenced or visibly occupied, and the only use made of same was an occasional grazing of cattle which strayed thereon while grazing upon the 9.29 acres."

The following is from the opinion in West Production Company v. Kahanek, 132 Texas 153, 158, 121 S.W. 2d 328:

"The use of such newly inclosed land by the defendant in error for grazing cattle did not, of itself, constitute an actual and visible appropriation as provided in Article 5515. Fuentes v. McDonald, 85 Texas 132; Mhoon v. Cain, 77 Texas 316. Where the character of use of inclosed land, by a claimant of adverse possession, is not such as to constitute, of itself, an actual and visible appropriation of the land, it may be safely said that such use cannot be aided by a fence which casually created the inclosure, and to the construction of which fence neither the claimant of adverse possession nor any person under whom he claims has contributed. See Vineyard v. Brundrett, 42 S.W. 232. (Writ ref.) Our limitation statutes do not contemplate that a claimant of adverse possession can derive aid, in establishing his claim, from an inclosure casually created by third persons in effecting a different purpose of their own, and who are strangers to both the claimant of adverse possession and the true owner of the inclosed land. In such a case, the inclosure, so far as our limita-

tion statutes are concerned, has no more effect than if same had never come into existence."

The two decisions from which the foregoing quotations are taken were cited with approval and followed in McKee v. Stewart, 139 Texas 260, 162 S.W. 2d 948. In that case possession of part of the tract in controversy was permissive, but that was not true of the small area west of the creek, which was included in the enclosure casually or as a matter of convenience in the extension of the possessor's fences.

■ The undisputed facts in the instant case show that petitioner's father entered into possession of the land within the enclosed 747.58 acres under three deeds duly recorded that conveyed to him several tracts of land constituting the northeast part of that area. According to the authorities above quoted and many other authorities his possession (and petitioner's possession which has been the same as that of his father) is referable to the deeds, is presumed to be in conformity with them, and is confined to the limits of them; and in order for him to have acquired title by adverse possession of additional or adjoining land outside the limits of the boundaries of the deeds he must have had actual possession of the additional land of such character as of itself to give notice of an exclusive, adverse possession.

The disputed tract is in the extreme southwest end of the enclosed area. Between the land which petitioner's father acquired by deeds and the disputed area is a tract of 60 acres which belonged to the State. Cattle on the deeded land could not reach the disputed area without going across the tract owned by the State. All of the watering places within the enclosed area are and have been on the deeded land, the nearest watering place being about a mile from the disputed tract, so that any cattle that might come from the deeded land to the disputed tract would have to go back about a mile, crossing the tract owned by the State, in order to obtain water. The best land and the best grass in the enclosed area is within the bounds of the deeded land. Much of the disputed area is rough, part of it is grown up with salt cedars, and only a part of it has grass of average quality. On account of the physical facts, and according to petitioner's testimony, the substance of which has been stated, a few of the average number of 30 cattle kept within the enclosure occasionally went from the deeded land across the tract owned by the State and onto the area in controversy, and occasionally were seen there.

The claimants of adverse possession had no part in the construction of the fences that enclosed the large area. Those fences stood where they are now and formed part of the fence enclosing the 747.58 acres when petitioner's father acquired the northeast part of that area by deeds. By whom the fences were built and for what purpose the record does not disclose. They were convenient as forming an enclosure which petitioner's father and petitioner could use for grazing the land that belonged to them.

Thus the area in controversy was, according to the undisputed evidence, casually or incidentally enclosed, and was occasionally used, and on the authorities cited the possession and use were not of such character as of themselves to give notice of exclusive, adverse possession.

■ Closely related to the principle of incidental or casual enclosure is the question of the presence or the absence of the essential hostile claim or "claim of right." Article 5515 of the Revised Civil Statutes defines adverse possession as "an actual and visible appropriation of the land, commenced and continued *under a claim of right* inconsistent with and hostile to the claim of another." (Emphasis added.)

In Houston Oil Company v. Jones, 109 Texas 89, 198 S.W. 290, the court carefully defined the meaning of the words "claim of right" as contained in the statute. It was there pointed out that notwithstanding the use of these words the court has held and holds that a naked trespasser may acquire a limitation title under the ten years statute. The court's definition of the words is: "The 'claim of right' to which the statute refers simply means that the entry of the limitation claimant must be with the intent to claim the land as his own, to hold it for himself; and such must continue to be the nature of his possession." The opinion states that "claim of right" is an essential element of adverse possession. And the intention of the possessor to claim the land as his own or to hold it for himself must be manifested by open or visible act or declaration showing such a purpose.

■ Petitioner had the burden of proving the elements of adverse possession, including "a claim of right." In Moore v. Wooten (Com. App.) 280 S.W. 742, 748, it is said that "One who seeks to establish title to land by virtue of the statutes of limitation assumes the burden of proof upon this issue, and this proof must be clear and satisfactory." See also Urschel v. Garcia, 164 S.W. 2d 804, 805.

"No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by the intent on the part of the occupant to make it so. The naked possession unaccompanied with any claim of right will never constitute a bar." Houston Oil Company v. Stepney, 187 S.W. 1078, 1084, application for writ of error refused. See also Hopkins v. Waterstreet, 275 S.W. 303; Mosley v. Gulf Production Company, 111 S.W. 2d 726; Shaw v. Windham, 155 S.W. 636, application for writ of error refused; Lyons v. Pullin, 197 S.W. 2d 494, 501.

Claim of right must be manifested by declaration or by open or visible act. If there is no verbal assertion of claim to the land brought to the knowledge of the landowner, the adverse possession must be so open and notorious and manifested by such open or visible act or acts that knowledge on the part of the owner will be presumed. Hopkins v. Waterstreet, 275 S.W. 303.

There is no evidence in the record of any verbal claim of ownership of the land in controversy by petitioner or by petitioner's father. We have seen that the incidental enclosure of the land and the occasional grazing of it do not constitute evidence of adverse or hostile possession, and this means also that they do not constitute evidence of "claim of right." Other facts in the record, instead of tending to prove open or visible acts disclosing an intention to claim the land, negative the existence of such an intention. Neither petitioner nor his father ever paid taxes on the disputed land, although they paid taxes on the land they held under the deeds. They never rendered the disputed land for taxes. They never improved the land, never placed a watering tank on it. They never executed any title instruments affecting it, although they did execute such instruments affecting the land held by them under deeds. There is no proof of any open or visible act on the part of petitioner or his father that manifested an intention to claim the land as his own.

■ Petitioner did testify that he and his father always claimed the disputed tract. This is either testimony about a mental process or the expression of a mere opinion or conclusion. "The 'claim of right inconsistent with and hostile to the claim of another' includes more than 'mental process' in the possessor; there must be 'external circumstances discovering that inward intention'." Scott v. Rodgers, (Com. App.) 6 S.W. 2d 731, 734. See also Titel v. Garland, 99 Texas 201, 206, 87 S.W. 1152. Petitioner's opinion or conclusion that he and his father claimed the land or possessed it adversely is not evidence of an open or visi-

ble act manifesting an intention to claim the land adversely, and it is not evidence that will support a claim of limitation by adverse possession. Mhoon v. Cain, 77 Texas 316, 14 S.W. 24; Urschel v. Garcia, 164 S.W. 2d 804. The opinion or conclusion is not supported by any evidence of open or visible acts in relation to the tract in controversy. From its external manifestations the possession of the enclosed 747.58 acres "could properly be considered by the owner (of the disputed tract) to be a part of that rightfully asserted by the possessor of his own land and did not therefore have that clear and unambiguous quality essential to an adverse possession hostile to the claim of the true owner." Smith v. Jones, 103 Texas 632, 635, 132 S.W. 469, 31 L.R.A. (N.S.) 153.

Petitioner further testified that his father bought all the land that was under fence, evidently meaning the entire enclosed 747.58 acres. This also is the expression of an opinion, clearly shown to be nothing more than an opinion by petitioner's further testimony that "you would naturally buy all that was under fence, you would expect to buy all of it," and is further shown to be but an opinion by petitioner's testimony that he was not present when his father bought the land. Petitioner's father made three distinct purchases of land, all being in the northeast part of the enclosed area, and obtained deeds from three different vendors at different times, the deeds describing the tracts conveyed by metes and bounds, with no reference to any enclosure or to any fences. There is no evidence of any intention or effort on the part of petitioner's father to buy all the land in the enclosure. The opinion expressed by petitioner is not only not supported by the record; it is contradicted by the record.

The juudgment of the Court of Civil Appeals is affirmed.

Opinion delivered March 31, 1954.

MR. JUSTICE GRIFFIN joined by JUSTICES CALVERT and SMITH dissenting.

I cannot agree with the majority opinion that, as a matter of law, there was no fact issue raised upon the petitioner's plea of limitation whereby he recovered a judgment in the trial court for the 56.85 acres of land in controversy. The majority opinion fails to give any probative force to that evidence sustaining the findings of fact by the trial judge; but, on the contrary, seizes on isolated testimony to sustain the judgment of the Court of Civil Appeals reversing and rendering the trial court's judgment.

A recitation of the evidence becomes necessary to point up the fallacy of the majority opinion. The testimony shows that in October of 1919, J. T. Orsborn, father of petitioner, purchased by warranty deed 160 acres of land known as the David Davis Survey and 150.5 acres of land known as the E. M. Ellis Survey. J. T. Orsborn went into possession under those deeds, and the fences, inclosing the pasture of which he took possession and began using for pasturing his livestock, were located at that time in the same position as they were located at the time of the trial of the cause in October, 1952. These fences, at that time, and at all times since, formed an inclosure for that pasture. The Davis land was in the extreme east end of the pasture and there was a fence on the east dividing this Davis land from the lands in Section 80, H.&T.C. Ry. Co. Survey. J. T. Orsborn, by warranty deed, purchased 370 acres, being the west part out of Section 80 on December 12, 1919, and went into possession of said land, and on November 8, 1921, purchased the remaining tract, being 120 acres out of the northeast corner of Section 80. The total acreage purchased by J. T. Orsborn by these three warranty deeds was 800.2 acres of land. The land inside the enclosure of the tract was 747.58 acres. It is not surprising that when J. T. Orsborn took possession of the enclosure containing 747.58 acres, he should have thought that all of the land inside such enclosure was contained in the description in his deeds. There was also a fence there on the north line of the Davis and Ellis Surveys separating these lands from Section 88, H.&T.C. Ry. Co. Survey on the north. Lying west, and adjoining the Ellis Survey, was a 60-acre tract of land, included in the pasture enclosure, which, for the first time in 1951, was found to be vacant state land. This land was patented in 1951 to Mrs. J. T. Orsborn as the person entitled to purchase such vacancy under the provision of Article 5421c (6), Vernon's Annotated Texas Civil Statutes. To satisfy the requirements of such article one must be a "good faith claimant" which is defined in the article to be a person occupying or using such vacancy under a good faith belief of ownership, and such person must have had the vacancy in his enclosure and in his possession for a period of ten years in the good faith belief that he was the owner thereof. West, and adjoining this state land, is the 56.85 acres of the J. G. Eustis Survey No. 2, title to which is involved in this litigation. This Eustis Survey was and is a part of the enclosed pasture, possession of which was taken by J. T. Orsborn, and which he and Tom Orsborn have used continuously since 1919 for pasturage and grazing of their livestock. The north fence enclosing the Eustis Survey is a continuation of the fence along the north line of Section 80, the C. M.

Brown, David Davis, E. M. Ellis and Mrs. J. T. Orsborn Surveys.

The majority opinion says that the "disputed tract was casually enclosed together with the land owned by petitioner and his father and a tract of land owned by the State, all enclosed by a fence, not constructed by petitioner or his father." There is no dispute but that this land was in the enclosure of J. T. Orsborn and Tom Orsborn who succeeded to the pasture after his father's death in 1933. The majority opinion also lays stress upon the fact that the warranty deeds conveying the east part of the pasture consisting of Section 80, C. M. Brown, D. Davis and E. M. Ellis Surveys make no mention of the fences. I take it there is no need to cite authorities to sustain the proposition that all fences located on the lands conveyed pass under the deed, unless specifically excepted or reserved. Beginning at the northeast corner of Section 80, and being the northeast corner of the Orsborn enclosure, the north fence of the enclosure constitutes the south fence of a lane (fenced on the north side) dividing Sections 80 and 81, the entire length of their common boundary; thence westward this north fence is extended at the same variation along the north line of the Brown, Davis and Ellis Surveys to a point on the north line of the Mrs. J. T. Orsborn Survey, which is a short distance beyond the midpoint of this north line of the Mrs. J. T. Orsborn Survey and also a short distance east of the southwest corner of Section 88, H.&T.C. Ry. Co. Survey (which adjoins Section 81 on the west). At this point the north fence changes its variation a few minutes so as to run a little more to the northwest, so that when the fence reaches the northeast corner of the Eustis Survey, it is 8 feet north of the true corner as located on the ground by the survey made in 1951. At the northwest corner of the disputed tract where the north fence intersects the east fence of the Red Bird Crossing Lane, the north fence is some 37 feet north of the line between the Eustis Survey and Section 89 (which adjoins Section 88 on the west). As a result of this error in variation there is .62 of an acre of Section 89 included within the Orsborn pasture enclosure, but the owners of Section 89 were not a party to this suit, and title to that .62 of an acre is not in issue. The extreme western enclosure of the Orsborn pasture is the east fence of what is called Red Bird Crossing lane. This lane is fenced on the west side also, and this lane divides, or segregates, the 56.85 acres of Eustis Survey No. 2 from the balance of the Eustis Survey No. 2 on the west. Tending to prove that the fence along the north line of the disputed tract was erected for the purpose of enclosing the disputed tract is the fact that the extension of such fence

begins on the west side of Red Bird Crossing lane some 60 to 75 feet north of the intersection of the Orsborn pasture fence with the lane's east fence, and proceeding farther westerly makes a material change in variation so that it intersects the west line of Section 89 some 878 feet north of the southwest corner of Section 89. To my mind, this shows that the north fence of the disputed tract was not erected to divide Section 89 from the Orsborn pasture, but, on the contrary, was erected to enclose the Orsborn pasture. The variation of this north fence from the east to Red Bird Crossing lane is within a few minutes of the variation of the south line of Section 89, while west of the lane the variation is much greater. Had the owner of Section 89 been erecting fences to enclose his land, it is clear to me he would have tried to put his fence on his south line all the way across the south of Section 89. The erection of two fences along Red Bird Crossing lane also shows to me that the owner of the Orsborn pasture was consciously segregating his pasture from the land on farther to the west and being the rest of the Eustis Survey. The testimony is to the effect that until the death of J. R. Orsborn in 1933, he thought the land which he had purchased by deed included all the land in his enclosure.

J. T. Orsborn never knew of the vacant state land inside his enclosure. Since J. R. Orsborn's death, Tom Orsborn, until 1951, thought all of the land in their enclosure was included in the deeds to his father, and so did Mrs. J. T. Orsborn. All of the east fence is upon the east boundary of the deeded land, and I suppose no claim can or will be made that such fence was not consciously built to make the east fence of the Orsborn pasture, and to segregate the Orsborn land from the land in Section 79 (adjoining Section 80 on the east). This leaves only the south fence enclosing the Orsborn pasture. Beginning at thesoutheast corner of the pasture, and being in the east line of Section 80, that fence generally follows the meanders of the Brazos River until it joins the east fence of Red Bird Crossing lane at the south corner. The testimony is to the effect that a portion of this fence has been washed out and repaired and moved farther north since 1919, but, otherwise, is in the same location as in 1919. There is also testimony that the river has changed its course so that in places it is farther south than it was in 1919, thus leaving a wider body of land south of this fence and north of the river than there was in 1919. The evidence shows no other persons who could have been interested in building this south fence of the enclosure save the owners of the Orsborn pasture. There is testimony to the effect that J. T. Orsborn and Tom Orsborn have at all times since 1919 maintained and repaired these outside fences and that

when the south fence would wash away they would repair and replace it as soon as they could get to it. This testimony is undisputed. There is testimony, which is undisputed, that this outside fence at all times (except when washed out) has been sufficient to keep in Orsborn's cattle. Also, there is undisputed testimony that no other person has used this entire pasture or enclosure from 1919 to the time of trial except Orsborn, his tenants and workmen. There is no dispute but that such possession as Orsborn has had has been continuous. Further, Tom Orsborn testified many times to the fact that his father claimed all the land inside the fences, and that since his father's death, he, Tom, had claimed, and at the time of trial was claiming, all of the land inside the enclosure. The majority opinion says these statements are conclusions. In the case of Nagel v. Kiibler, et al, 212 S.W. 2d 1009, ref., n.r.e., it is stated:

"It is the settled law in this state that declarations of a person made while in possession of property, though in their nature self-serving and hearsay, are admissible to explain the nature and character of his possession and to show the extent of his interest and the character of his holding. 17 Tex. Jur., p. 597, Sec. 249; Smith v. Burroughs, Tex. Civ. App., 34 S.W. 2d 364.

"A witness for appellees, J. F. Beck, son of appellee William F. Beck, testified on direct examination that on several occasions he heard his father say that he claimed the land involved in this suit. He stated that the declaration was made by Wm. F. Beck at his residence on a tract of land adjoining and separated by a fence from the land in controversy.

"Appellants' contention cannot, we think be sustained. It is the established rule that the declarations of a person made while in possession of property are admissible to explain the nature and character of his possession. At the time William F. Beck made the statement to his son that he owned said property, he was in possession of the property, and had used it for a period of years."

Also the case of Gilbert v. Green, 150 Texas 521, 242 S.W. 2d 879, holds that Parsons, as a witness, when sworn and subject to cross-examination, was competent to testify as to whether he claimed ownership at the time he was in possession, and could be impeached by prior contradictory statements. There was no objection made to any of the statements as to claims of ownership by J. T. or Tom Orsborn, and much of such testimony was elicited from Tom Orsborn upon his cross-examination by the respondent, and in answer to questions as to the claims of the respective Orsborns. It is undisputed that the Orsborns, up until

the survey was made in 1951, thought the 60 acres of vacant state land was included in the description of the deeds, and that their use and possession of such state land was the same as of the disputed tract. Belonging to the State, no title could be perfected by limitation to the 60 acres. Upon cross-examination, the respondent (defendant below) introduced in evidence the application filed by Mrs. J. T. Orsborn to purchase this vacant state land, and the supporting affidavit made by Tom Orsborn as to his mother's possession. In the application Mrs. Orsborn states "this land has been claimed and used by Mrs. J. T. Orsborn for the past twenty-five years and that during that period of time was used by Mrs. J. T. Orsborn for grazing purposes and during all of the above time has been under fence or partial fence." In his accompanying affidavit, Tom Orsborn says "that for the past twenty-five years the said Mrs. J. T. Orsborn, mother of the affiant, has been using said land for grazing purposes and that said land has been wholly or partially fenced during said period of time. That until said land was recently leased for oil and gas affiant and his mother believed said land belonged to them." He explained that since the land was fenced only on two sides, the words "wholly or partially fenced" were used.

Another significant fact as bearing on the use and possession of this tract by the Orsborns is the fact that from March 8, 1923, to the date of trial various warranty deeds conveying the title to the Eustis Survey No. 2 had been executed as follows: March 8, 1923; May 9, 1923; August 20, 1928; December 8, 1928; November 29, 1932; October 4, 1938; October 12, 1938; July 13, 1939; January 8, 1941, to C. B. Long, the owner of the surface of the Eustis Survey No. 2 at the time of trial. The evidence shows that none of the grantees in these nine warranty deeds had ever asserted any claim to any part of the Eustis Survey enclosed in the Orsborn pasture or had ever made any claim to said disputed tract, or ever challenged the ownership of same by the Orsborns. Upon the trial of this cause, C. B. Long, the owner since January 8, 1941, of the record title to the disputed tract, filed a disclaimer of any title or interest in this disputed tract.

In this case the Orsborns were claiming title to the 56.85 acres of the Eustis Survey by virtue of the ten-year statute of limitation. Article 5510, 5514 and 5515, Vernon's Annotated Civil Statutes. Under the express provisions of Article 5510, a fence enclosing a tract of land of less than 160 acres is not necessary to recover title, provided the other requirements of the above Articles are met. There is only 56.85 acres of land

involved in this suit; therefore, an enclosure is not necessary. An enclosure is a circumstance to show possession and use and adversity and hostility of claim, and is also a circumstance as to the claim of right. As said in Richards v. Smith, 67 Texas 610, 4 S.W. 571: "We do not think an actual enclosure, by fence or otherwise, necessary in all cases to give an exclusive possession. * * * When the acts done upon a tract of land are such as to give unequivocal notice to all persons of a claim to it, adverse to all others, and this is accompanied by an actual possession exclusive in its character, then limitation will run in favor of the person so asserting adverse claim and enjoying an exclusive possession from the time such exclusive occupancy began, whether the land is enclosed or not." In Brown v. Fisher, Tex. Civ. App., 193 S.W. 357, 361, the court reviewed the decisions and observed: "We have carefully examined each of these authorities, and we find that they do not sustain appellants' contention that an actual enclosure under all circumstances is necessary to constitute adverse possession of land. It is true that the court, in each of these cases in discussing the question of adverse possession, stated that *an enclosure of land was one of the strongest evidences of an adverse and exclusive possession,* but the court did not say in either case that an enclosure was indispensable in order to constitute adverse possession." See also 2 Tex. Jur. 88, Sec. 46; 2 C.J.S. 539, Sec. 26. Enclosures have been held necessary to sustain limitation claims based on pasturing and grazing land. Public lands are considered as "commons."

J. B. Hankins, who lived in the vicinity of the land since 1921, testified that the outside fences were in the same place as they were in 1921 except as washed out and replaced by Orsborn, and that the fences had not been down for any appreciable period of time; that Mr. J. T. Orsborn, during his lifetime, and since his death, Tom Orsborn and Mrs. Orsborn had used this pasture for grazing their livestock. He also testified that Orsborn's cattle "just ranged all over the pasture." Further, Hendrix testified he "didn't know there was a disputed tract (the 56.85 acres out of the Eustis Survey) until this (lawsuit) came up." Hendrix also testified that during some dry years he had driven his cattle with Orsborn's permission across Orsborn's pasture to the river for water, and had with Orsborn's permission put in some gates (for use in taking the cattle to the river) in the fences enclosing Orsborn's pasture, and when he no longer needed these gates he had closed up the fences.

Roy Day testified he had known this disputed tract for 20 to 30 years, and prior to the time Mr. Orsborn "bought it." He

had worked for Mr. Orsborn as a ranch hand "quite a bit" from "beginning in the 20's" until Mr. Orsborn's death, and since 1920 he had seen cattle on the disputed tract, and on cross-examination as to where the cattle stayed in the pasture he testified "they went all over it." All of the evidence shows that this tract of land is rough, uneven land and not suitable for agricultural purposes. The only use it could have, according to the testimony, would be as a pasture and for grazing purposes. There is testimony that the north and west portions of this tract are composed of small hills, which occupy from one-third to one-half of the tract, but that even on this (except on hilltops) there is "bunch grass," "scattered grass," "mixed mesquite" and "gamma grass." The testimony with regard to salt cedars is that they are in the bed of the river, and as to the 56.85 acre tract "you don't have any salt cedars until you get about half way down from there (evidently the river bed) to a point opposite the east corner of the 56.85 acre tract." The south fence excludes the river from the enclosure. One of the respondents' attorneys testified that the salt cedars were in the river, and scattered groups of grass on the hills, and from the foot of the hills in the direction of the river there was very heavy cedar and some grass. The testimony of other witnesses as to grass and vegetation on the disputed tract is that on the lower part there is a flat covering about half of the tract which has good grass; that the vegetation is about like the rest of the pasture, except the middle part of the pasture has better grass than the tract in dispute.

To constitute "adverse possession" the party occupying the land must in some way appropriate the land to some purpose to which it is adapted. Hardy v. Bumpstead, Comm. App., 41 S.W. 2d 226, 227, (4-6), 76 A.L.R. 1488; Nona Mills v. Wright, 101 Texas 14, 102 S.W. 1118, 1121.

"* * * it is evident that in determining what will amount to an actual possession of land, considerable importance must be attached to its nature and to the uses to which it can be applied, or to which the claimant may choose to apply it. What is adverse possession is one thing in a populous country, another thing in a sparsely settled one, and still a different thing in a town or village. * * * The governing questions of law, regardless of the character of the premises, are the same in every case, but the question of fact may be presented by evidence in a great variety of ways, according to the circumstances. As a general rule it will be sufficient if the land is so used by the adverse claimant as to apprise the community in its locality that it is in his ex-

clusive use and enjoyment, and to put the owner on inquiry as to the nature and extent of the invasion of his rights; and this is especially true where the property is so situated as not to admit of permanent improvement. In such cases, if the possession comports with the usual management of similar lands by their owners, it will be sufficient. Neither actual occupation, cultivation, nor residence is necessary where neither the situation of the property nor the use to which it is adapted or applied admits of, or requires, such evidences of ownership." 1 Am. Jur. 866, *Adverse Possession*, Sec. 131.

To the same effect see Heard v. State, 146 Texas 139, 204 S.W. 2d 344 (5); Price v. Humble Oil & Refining Co., 152 S.W. 2d 804 (10, 11), ref., want of merit; Wallis v. Long, Tex. Civ. App., 75 S.W. 2d 138, ref. (loc. cit. top 1st. col., p. 142); Young v. City of Lubbock, 130 S.W. 2d 418 (2, 3), no writ history. The statute does not require that the claimant "cultivate, use *and* enjoy" the land claimed. It only requires that he do one of the three; i.e., "cultivate, use, *or* enjoy." Hess v. Webb, Tex. Civ. App., 113 S.W. 618 (11), affirmed 103 Texas 46, 123 S.W. 111; McDonald v. Cartwright, Tex. Civ. App., 72 S.W. 2d 337 (1), dismissed, want of merit.

In Caver v. Liverman, 143 Texas 359, 185 S.W. 2d 417, 419, (3, 4), this Court said:

"The land was so rough that it was difficult for cattle to travel over it, and there was but little grass on part of it. Nevertheless, Crawford testified that his cattle grazed on the land and that he cut wood off it. This, we think constituted *some evidence* of adverse possession of the land for the statutory period. McDow v. Rabb, 56 Texas 154; Moran v. Moseley, Tex. Civ. App., 164 S.W. 1093; 2 Tex. Jur. 91." (Emphasis added).

In the case of Wingfield v. Smith, 241 S.W. 531, ref., the claimant to the land was pasturing land which was partly enclosed by another's fence. A limitation title was sustained.

In Houston Oil Company of Texas v. Skeeler, 178 S.W. 2d 740, no writ history, the court, in sustaining a judgment for defendants who were claiming title under the ten-year limitation statute, says: "The record does not disclose who built the fences thus helping to enclose the tract of land nor for what particular purpose the said fences were built, but the record does show that appellees (winning defendants) for twenty years or more had looked after said fences and kept them in good repair with the

possible help of adjacent property owners, but the record does not disclose that anybody other than appellees claimed any right or use of said fences."

In the case of Nelson v. Morris, 227 S.W. 2d 586, ref., n.r.e., and cited with approval by the Supreme Court in Caver v. Liverman, supra, the appellants were claiming they were entitled to an instructed verdict against the limitation claimant for the following reasons:

"Appellants contend they should have received an instructed verdict because it is undisputed that the deeds comprising the Perryman ranch do not embrace the land in controversy; that the Perryman ranch lying west and north of the land in controversy was never separated from the land in controversy by a fence and that cattle grazing on the Perryman ranch could enter on the land in controversy and graze; that the land in controversy is extremely rough with breaks and deep ravines and because of its roughness it could not be traveled except on foot or horseback; that appellees nor any prior owner of the Perryman ranch *did not construct the fences that effect an enclosure of the land in controversy with the Perryman ranch.* That the pasturing of livestock on land is not sufficient to give title by limitation. There was nothing to advise Berry of any adverse claim of his land because Morris and his predecessors had a perfect right to run stock in that pasture, they were not required to build a fence around that land to keep stock off of neighboring land, and cite for authority the following cases," and citing authorities.
"We do not find it is absolutely necessary in order to establish title under the ten year statute that the fences surrounding the property in question should have been built by the person claiming limitation (2 Tex. Jur., p. 88, Sec. 46), but the law is well established in this state, including Article 5515, R.C.S., to the effect that in order to establish title under the ten year statute the adverse possession must be an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another. In order that such possession will establish title, the true owner must have actual knowledge of the hostile nature of the claim or the possession must be so open, visible, notorious and hostile as to raise the presumption that the owner had notice that his rights were being invaded intentionally and with the purpose of asserting an adverse title to his land. Houston Oil Co. v. Stepney, Tex. Civ. App., 187 S.W. 1078; Burton v. Holland, Tex. Civ. App., 278 S.W. 252; Baker v. Fogle 110 Tex. 301, 217 S.W. 141, 219 S.W. 450; Stewart v. McKee, Tex. Civ. App., 150 S.W. 2d 415;

Young v. City of Lubbock, Tex. Civ. App., 130 S.W. 2d 418; 2 Tex. Jur. p. 88, sec. 46; McAnally v. Texas Company, 124 Tex. 196, 76 S.W. 2d 997; Port City Co. v. Peck, Tex. Civ. App., 42 S.W. 2d 275; Johnson v. Sullivan, Tex. Civ. App., 163 S.W. 1015; Monroe v. Lyons, Tex. Civ. App., 189 S.W. 2d 90."

The following cases also discuss the sufficiency of the enclosure and whether or not it is necessary same be built by the claimant in possession. Dunn v. Taylor, 102 Texas 80, 113 S.W. 265, 2nd. col., p. 268; Ogletree v. Evans, 248 S.W. 2d 804, ref., n.r.e.; Port City Co. v. Peck, 42 S.W. 2d 275, no writ history (claimed land enclosed with others and pastured); Masterson v Pullen, 207 S.W. 537, no writ history; Sharrock v. Ritter, 45 S.W. 156, no writ history.

I believe the above quoted and cited authorites effectively answer the majority opinion's claim that there is no evidence of an enclosure to comply with the terms of Article 5510, Vernon's Annotated Civil Statutes. Also, I believe they answer the contention that since there was no testimony showing who built the fences, Orsborn's case is weakened.

Next, I will discuss the majority's holding that there is no evidence of probative force to show occupation, use and enjoyment under a claim of right, adverse and hostile to the true owner. I have already quoted the testimony of the witnesses on these questions so I shall not repeat that. Article 5514, Vernon's Annotated Civil Statutes, defines "peaceable possession" as "such as is continuous and not interrupted by adverse suit to recover the estate." All of the evidence shows there was no suit filed until 1951, and all of the evidence shows that the Orsborns had continuous possession of this pasture from 1919 to date of trial in 1952. This fact is not controverted by any evidence. Article 5515, Vernon's Annotated Civil Statutes, defines "adverse possession" as "an actual and visible appropriation of the land commenced and continued under a claim of right inconsistent with and hostile to the claim of another."

Judge Stayton, speaking for the Court, in the case of Richards v. Smith, 67 Texas 610, 4 S.W. 571, says: "The facts must clearly show the adverse claim, and from its nature, as well as an exclusive possession, *of which an enclosure substantial and permanent in character, accompanied with such use as the land is adapted to, is often the most satisfactory evidence.*" (Emphasis added.) Where the acts done upon a tract of land are such as to give an unequivocal notice to all persons of a claim to it ad-

verse to the claim of all others, and this is accompanied by an actual possession, exclusive in its character, then limitation will run in favor of the persons so asserting adverse claim, and enjoying exclusive possession from the time such exclusive occupancy began, whether the land be enclosed or not.

In Craig v. Cartwright, 65 Texas 413, this Court quotes from the case of Charle v. Saffold, 13 Texas 94, 112, as follows: "It thus appears that naked possession will secure title for six hundred and forty acres without enclosure, or one thousand or two thousand with enclosure; and the circumstances under which the possession is taken are altogether immaterial to the right, provided the occupant claims for himself and adversely to others. No matter how tortious or wrongful may be the seizure, if possession be continued for the time limited by statute, it will give title preclusive of all claims; * * * no question is made or is open relative to the *bona fides* or *mala fides* of the possession." In discussing evidence of adverse claim the Court then says: "Possession, with the exercise of such rights as pertain to an owner alone, must be deemed sufficient evidence of adverse claim, in the absence of some evidence indicating that it is held in subordination to the title of the real owner."

In the case of Lion Oil Refining Company v. White, Tex. Civ. App., 138 S.W. 2d 290, the court reversed a judgment upon an instructed verdict for the plaintiff (White) and rendered judgment for the defendants. Both parties claimed title under the ten-year statute of limitation. The court, in discussing whether or not possession was adverse, says:

"Appellee further contends that the evidence does not show that the possession of John R. Williams' predecessors was adverse. We do not sustain that contention. In Hartman v. Huntington, 11 Tex. Civ. App. 130, 32 S.W. 562, 563, the rule here applicable is expressed in the following language: "The question whether or not a possession is adverse to the owner of the land is mainly one of fact. If a particular holding is adverse in law, it is so because it is adverse in fact, and all that is necessary in order to reach a correct decision of such a question is to give to the facts in evidence their proper effect, and to determine just what they prove. Ordinarily, when a person in possession of land is shown to have used and enjoyed it as owners of lands usually do, the natural inference is that his possession was taken and held for himself as owner, and that it was "therefore inconsistent with and hostile to the claim of another." This inference prevails

unless something else is shown to qualify and explain the possession.' "

This Court, in White v. Glengarry Oil Co., 137 Texas 626, 627, 156 S.W. 2d 523, adopted the opinion of Section A of the Commission of Appeals which affirmed in part and reversed in part. However, with regard to those defendants who were appellants in the Court of Civil Appeals the opinion states this Court approved the reasoning of the Court of Civil Appeals supporting the rendition of judgment for the appellants.

In the case of Monroe v. Lyons, 189 S.W. 2d 90, ref., want of merit, the court, in affirming judgment for a limitation claimant, says:

"Appellants take the position that there is an entire absence of adverse claim on the part of William Smith Clayton to the premises that he occupied, if it be assumed that he was in possession of the lot and house located upon it. We think it has become established in this state beyond cavil that one in actual possession of land for the statutory period of ten years, in the absence of any evidence to explain his possession, or to show that it was disputed, or that the alleged fact of the possession was not true, is presumptively the claimant of the title. In other words, a constructive claim is imputed by reason of possession under such circumstances. Angell on Limitation, Chapter 31, Sec. 11; 2 Tex. Jur. Sec. 57. A few short quotations from the adjudicated cases are considered proper: 'Possession of premises usually carries with it the presumption of a claim of title, and in that sense operates as notice to the true owner that his title is disputed.' Boy v. McDowell, Tex. Civ. App., 207 S.W. 937, 938. "But in presumption of law, an actual possession must be regarded as adverse to all other titles or claims than that of the possessor, or such as have been recognized by him. And whenever a party permits such possession to be maintained, he does so at his peril.' Gillespie v. Jones, 26 Tex. 343. The Supreme Court of Texas, in the case of Baker v. Fogle, 110 Texas 301, 217 S.W. 141, 219 S.W. 450, quotes from an opinion by Chief Justice Phillips in Roseborough v. Cook, 108 Tex. 364, 194 S.W. 131, 132, as follows:

" 'The title by limitation ripens, primarily, only because, in such manner and for such period of time as the different statutes require, notice is given of the hostile claim. Under the three years statute, it is afforded by possession under title or color of title. Under the ten years statute, simply by possession.' "

In McCabe v. Moore, 38 S.W. 2d 641, writ dismissed, the court of Civil Appeals reversed a judgment upon an instructed verdict in favor of the record title owner. The claimant was in possession of the 23 acres in controversy under an enclosure with a 48-acre tract to which claimant had a record title. The Court of Civil Appeals held that the evidence established claimant's title as a matter of law. The disputed tract was used for grazing purposes only. The Court says:

"A plea of title by the 10-year statute of limitation is supported by possession for the required period and claim of ownership under a deed, although the deed does not include the disputed tract. Bruce v. Washington, 80 Tex. 368, 15 S.W. 1104; Henderson v. Nelson (Tex. Civ. App.) 284 S.W. 318; Daughtrey v. New York & Texas Land Co. (Tex. Civ. App.) 61 S.W. 947; Houston Oil Co. v. Olive Sternenberg & Co. (Tex. Com. App.) 222 S.W. 534; 2 Tex. Jur. 125, Sec. 65. So under this rule, the fact that appellants held adverse possession of the 23 acres under the belief that it was included in their deed to the east 48 acres of survey 18, and that they had perfected title to it, when in fact it was not so embraced, 'does not deprive it of any element necessary to support the plea of limitations.' Jayne v. Hanna (Tex. Civ. App.) 51 S.W. 296. And, since it appears that appellants took possession of all land inclosed by the fence, which had then been constructed for more than 11 years, and asserted ownership of the disputed tract within that inclosure for an additional period of more than 14 years, their claim of title by limitation is sustained, although they may have testified on the trial to the effect that they never knew any land was in their inclosure except the 48 acres described in their deeds. Sanders v. Moore (Tex. Civ. App.) 157 S.W. 441, 442 (writ ref.)."

In the case of McKee v. Stewart, 139 Texas 260, 162 S.W. 2d 948 (4), this Court, in discussing an adverse claim, says:

"It is true, as held by the Court of Civil Appeals, that from actual possession of land evidenced by fences enclosing it a presumption arises that it is adversely claimed by the person in possession. Thompson v. Richardson, Tex. Com. App., 221 S.W. 952; Boy v. McDowell, Tex. Civ. App., 207 S.W. 937. But the presumption, like other presumptions of fact, may be rebutted. Boy v. McDowell, Tex. Civ. App., 207 S.W. 937, 938; Hartman v. Huntington, 11 Tex. Civ. App. 130, 32 S.W. 562, 563 (Application for writ of error refused). Judge Williams, referring in the case last cited to the presumption or inference of hostile claim drawn

from proof of possession, said: 'This inference prevails unless something else is shown to qualify and explain the possession.' "

There is nothing in this record to qualify or explain the possession of the Orsborns on any theory other than that they were claiming this land and had been claiming same for 19 years prior to the execution of the first mineral reservation on the Eustis Survey No. 2 in 1938, and for some 28 years prior to the execution of the first oil and gas lease on the Eustis Survey No. 2 in 1947. Up to filing of this suit in 1951, the Orsborns had had possession of this tract about 32 years, and no one had ever tried to dispossess them. Surely, it cannot be contended that such long possession, use and enjoyment destroys the presumption of a claim of right as above set out in the above authorities. For other cases of similar holding see Mhoon v. Cain, 77 Texas 316, 14 S.W. 24; Humphreys v. Gribble, Tex. Civ. App., 227 S.W. 2d 235 (3, 4), ref., n.r.e.; Dortch v. Sherman County, Tex. Civ. App., 212 S.W. 2d 1018 (2-5), no writ history; Young v. City of Lubbock, supra, (7-10); Wallis v. Long, supra; Churchman v. Rumsey, 166 S.W. 2d 960, ref. want of merit.

The case of Broughton v. Humble Oil & Refining Co., 105 S.W. 2d 480, writ refused, a ten-year statute case, is authority for the holding that execution and delivery of a mineral lease by **record** owner of land not in actual possession did not affect position of plaintiffs who had been in adverse possession for six years, because record owner's constructive possession, by reason of being record owner, ceased when plaintiffs took possession under adverse claim, and only ouster or suit could interrupt running of limitation statute.

Adverse possession may be proved by circumstances of claimant's use of the property. Orman v. Shuttleworth, 201 S.W. 2d 69, no writ history.

The record owner of land is charged with notice of its location and boundaries, and will not be excused for ignorance of the particular claim of right under which his premises are held by those in possession of them. Brownson v. Scanlan, 59 Texas 222, 226; Randolph v. Lewis, Com. App., 210 S.W. 795 (2); 2 Tex Jur., 119, Sec. 63; W. T. Carter & Bro. v. Richardson, Tex. Civ. App., 225 S.W. 816, aff. 236 S.W. 978.

I think the reasoning in Wallis v. Long, supra, (75 S.W. 2d 141), with regard to adversity of possession under claim of right is particularly applicable in this case.

"The whole of the inclosure was used by Mayes and his children, and their descendants at all times for the pasturage of their cattle. Such being the facts, if an owner of the 519-acre tract had gone on that land at any time during the period from 1908 to 1929, fixed by the jury as the period in which they found appellees had adverse possession of the land, under the five- and ten-year statutes of limitation (Vernon's Ann. Civ. St. arts. 5509, 5510), he could only have gotten on the land by crossing a natural or artificial barrier sufficient to make the possession by the claimants of the large inclosure actual and exclusive; and if he had continued all around such inclosure, he would have found similar barriers for the entire distance. He would have also found Mayes cattle with his brand on them all over the pasture and would have found no one occupying any land in the inclosure or having any cattle thereon other than Mayes, his children, and devisees. We do not think that it can be doubted that these facts show an actual, visible appropriation of the land by appellees. The use and enjoyment of land necessary to make its possession adverse under our limitation statutes is only that to which the land is adaptable and capable of being used, Billingsley v. Houston Oil Co. (Tex. Civ. App.) 182 S.W. 373, 374; Dunn v. Taylor (Tex. Civ. App.) 107 S.W. 952. The undisputed evidence shows that the 519-acre tract, as well as all of the rest of the land in the inclosure, could only be used for pasturage purposes. The inclosure, a large portion of which was entirely surrounded by water, was generally known in the community as 'Mayes Island' or 'Mayes Pasture.' "

"The circumstances that the claimant asserted ownership under a deed, believing and claiming that the disputed tract was included in the grant—whereas in fact it was not—does not establish that his possession lacked hostility." 2 Tex. Jur. 125 and authorities cited in Note 20.

See the case of Chittim v. Auld, 219 S.W. 2d 702, ref., n.r.e., wherein the Court of Civil Appeals reversed a judgment for a record owner and rendered judgment for the possessor claimant of a 52.7 acre tract inside Chittim's fence inclosing other lands also, and which Chittim and his predecessors in title had mistakenly thought was included within the description contained in their deeds of purchase. The question of limitation title was the main question on which the cause turned and this Court, by refusing the application for writ of error, n.r.e., of necessity approved the action of the Court of Civil Appeals in reversing and rendering the cause.

It is not necessary for a claimant of land under the 10-year statute to have a deed, or other instrument of conveyance. Mc-Anally v. Texas Co., 124 Texas 196, 76 S.W. 2d 997; Black v. Terry County, Tex. Civ. App., 183 S.W. 2d 685 (5), no writ history.

Article 5510, Vernon's Ann. Civ. St., does not require that the claimant pay the taxes against the land claimed. Whether or not he did pay the taxes is admissible only as a circumstance regarding his possession and claim to the property as his own. It raises a fact issue for determination of the trier of the facts. Houston Oil Co. of Texas v. Holland, Tex. Civ. App., 196 S.W. 668, reversed and remanded on another point, 222 S.W. 546; Manning v. Standard Oil Company of Kansas, 67 S.W. 2d 919, writ dismissed; Lynch Davidson & Co. v. Beasley, 128 S.W. 2d 877; no writ history; Saunders v. Hornsby, 173 S.W. 2d 795, ref., want of merit.

Upon the holding of the majority that no fact issue is raised, I would cite the following authorities: Pearson v. Doherty, 143 Texas 64, 183 S.W. 2d 453, (4), wherein the Court says:

"Doherty contends that the evidence in this case entitles him to a judgment awarding him the title and possession of this land because it shows conclusively that Pearson did not claim adversely as against the true or real owner, and therefore shows that Pearson has not acquired title by the Ten Year Statute of Limitation. We overrule this contention. In our opinion the evidence contained in this record raises a fact issue on the question of adverse claim and possession. It is true that Pearson, in his deposition taken before the trial, stated that he was not trying to take this land away from those who owned it, but at the trial itself Pearson testified that since 1925 he had never acknowledged that any other person than himself owned this land, and that since 1925 he had always claimed it for himself. The record in this condition presents a fact question. Stewart v. Luhning, 134 Texas 23, 131 S.W. 2d 824; O'Meara v. Williams, Tex. Civ. App., 137 S.W. 2d 66."

In McCall v. Grogan-Cochran Lumber Co., 143 Texas 490, 186 S.W. 2d 677, this Court says:

"That the 84-acre tract was not fenced does not preclude the assertion of limitation title to it. 2 Tex. Jur. 90. If the limitation claimants' possession and use of the land to defined and marked boundaries, whether fenced or not, were sufficiently peaceable,

open, notorious and adverse to give fair notice of the extent and hostility of their claim and obtained for a sufficient length of time, the requirements of the statute would be satisfied. And whether there was such a possession and use here was a question for the jury to decide.

"The proofs tend to support the limitation claim of the petitioner to at least part, if not all, of the 84-acre tract. The evaluation of the evidence was for the jury, to which the issues of limitation thus arising should have been submitted."

Of course, I realize each case must rest upon its own facts, and while I believe there is abundant authority for holding that the Orsborn's proof, as a matter of law, entitled them to recover, I am sure that the authorities support the position that fact issues were made by the evidence. The following additional cases, I believe, bear out the above statement: Bruni v. Vidaurri, 140 Texas 138, 166 S.W. 2d 81, (7, 12 and 13); Greene v. White, 137 Texas 361, 153 S.W. 2d 575, (1, 2); Vergara v. Myers, Com. App., 239 S.W. 942. This last case is also authority that a limitation claimant may recover lands claimed by him, even though in an inclosure with land owned and used and claimed by others. Houston Oil Co. of Texas v. McGrew, 107 Texas 220, 176 S.W. 45 (5); Nelson v. Morris, Tex. Civ. App., 227 S.W. 2d 586, (7, 8), ref., n.r.e.; Wixom v. Bowers, 152 S.W. 2d 896, (10), ref., want of merit; Trice v. Stamford Builders Supply, 248 S.W. 2d 213, no writ history (holding lot under fence for 20 years and testifying that possessor was claiming, held sufficient to raise a fact issue); Jeffries v. Benavides, 220 S.W. 2d 712, ref., n.r.e.; Boone v. City of Stephenville, 37 S.W. 2d 842 (7-9), no writ history; Hartman v. Huntington, 11 Tex. Civ. App., 130, 32 S.W. 563, ref.

There being a fact issue raised by the evidence, then there can be no question but that this Court should apply the well recognized rule of law that in determining whether there is any evidence to sustain the judgment of the trial court we must presume that the evidence supports not only the express findings made by the trial court, but also any omitted findings which are necessary to support the judgment. Rule 299, Texas Rules of Civil Procedure; Bednarz v. State, 142 Texas 138, 176 S.W. 2d 562; Waters v. Yockey, Tex. Civ. App., 193 S.W. 2d 575; certified question answered 144 Texas 592, 192 S.W. 2d 769; Wisdom v. Smith, 146 Texas 420, 209 S.W. 2d 164 (6, 7). There is the further rule that on appeal the testimony offered by the party who won in the trial court must be taken as true. Rick v. Grubbs, et al, 147 Texas 267, 214 S.W. 2d 925 (1). The Supreme Court

considers the evidence most favorable to the party prevailing in the trial court. Blanks v. Southland Hotel, 149 Texas 139, 229 S.W. 2d 357; Hickman v. Hickman, 149 Texas 439, 234 S.W. 2d 410; Renfro Drug Co. v. Lewis, 149 Texas 507, 235 S.W. 2d 609, 23 A.L.R. 2d 1114; Schiller v. Elick, 150 Texas 363, 240 S.W. 2d 997. The majority opinion, in its evaluation of the evidence, applied the view exactly opposite to the above authorities.

I do not believe the grazing of the cattle, i.e., the use to which Orsborn put this land was incidental. There is evidence that "you saw the cattle down there every time you were on the disputed tract"; that the "cattle ranged all over the pasture"; that Tom Orsborn, or his hands, rode that pasture looking after the pasture from twice a week to every two weeks, and Tom saw cattle there every time he was on the disputed tract. The cattle grazed on this tract the same as on the other land in the pasture. The trial court found that the use of this land "for grazing horses, mules and cattle upon the lands" was not an incidental or temporary use and was an open and visible appropriation and use from 1919 to filing of the suit in 1951.

The majority recognizes that the cases of De Las Fuentes v. MacDonell, 85 Texas 132, 20 S.W. 43 and others, cited in connection therewith, are only authority for the proposition that grazing uninclosed lands is not sufficient possession or use to comply with the requirements of the statute. In this case we do not have uninclosed land, we have inclosed lands. To avoid the effect of the inclosure of the lands, as shown in this case, the majority seeks to engraft a new requirement upon the law— that of "a designed enclosure" of the lands. Vineyard v. Brundrett, 17 Tex. Civ. App., 147, 42 S.W. 232, ref., (writ of error denied prior to 1927) is cited as authority for such holding. It is true that case was by the Court of Civil Appeals reversed and rendered against the limitation claimant under the 5-year statute, and on account of an insufficiency of evidence to sustain the adversity and hostility of claimant's possession. The reasoning of the Court is as follows:

"By far the greater part of the boundaries were the shores of the bay, with nothing to indicate that they were relied on or used to inclose the land, and keep out any person desiring access thereto. The inclosure was not such as to show the assertion by any one of a claim hostile to the true owner, nor, indeed, such as to give evidence that the land was in fact designedly inclosed. The bay shores were natural barriers, and the only artificial barriers erected were the fences built to inclose the land on the other side

of them, with nothing to indicate that they were being used to inclose the land in controversy. To give effect to the fences and bay shores as an inclosure of the land, there must have been acts distinctly indicating that they were relied on as such. The artificial barriers must be sufficient to notify the public that the land is appropriated. Brumagim v. Bradshaw, 39 Cal. 24. When we take into consideration the extent of the bay shores, the size of the tract, the inclosures of others, and the facts that the fences were made to inclose other lands than those in controversy, and that the defendant did not claim title to all the land within the barriers relied on to form the inclosure, the evidence is clearly insufficient to show a possession to support the bar of five years' limitation."

In that case the claimant, of course, relied upon his deed and "color of title" rule applied in his case. The requirements as to possession under the five-year statute are the same as under the ten-year statute.

In the McKee v. Stewart case, 139 Texas 260, 162 S.W. 2d 948, the trial court, without jury, had rendered a judgment adverse to the limitation claimant, and the Court of Civil Appeals had reversed and remanded. This Court affirmed the judgment of the trial court. The case was decided upon the basis that a fact issue was raised by the evidence introduced, and that the trial court's finding was conclusive against the party suing. This Court said: "We agree with the conclusion expressed by the Court of Civil Appeals that the question whether Benjamin Roberson actually cultivated, used or enjoyed the 4.4 acre area was, under the evidence, an issue of fact and that the trial court's finding that he did not cultivate, use or enjoy it is, if material, conclusive against defendants in error upon the question of their asserted title by limitation." In the present case, the McKee case is relied upon to establish, as a matter of law, that the Orsborns did not cultivate, use or enjoy the disputed tract by pasturing same. I say that case is authority that a fact issue was raised in the case at bar, and the trial court's finding that the Orsborns did cultivate, use or enjoy the disputed tract is conclusive against the respondents herein.

Harmon v. Overton Refining Co., 130 Texas 365, 109 S.W. 2d 457, 110 S.W. 2d 555, is relied upon for the holding that, as a matter of law, a judgment should be rendered in this case for the respondents. That case has entirely different facts from our case, as can be seen by reading the case, and also reading the Court of Civil Appeals' opinion in 81 S.W. 2d 207. In the Harmon

case the undisputed facts show that Harmon was claiming that his deed covered the disputed tract of land, while in our case no claim is made that the Orsborns' deed covers the disputed tract of land. Everyone recognizes that the Eustis Survey is not included in any Orsborn deed. The Orsborns claim that they went into possession of the disputed tract thinking it was included in their deed. This is their entry "under claim of right" to support their limitation claim. In the Harmon case, the disputed tract was owned by the vendor who deeded the 9.29 acres of land to Harmon's predecessor in title. The original vendor and the vendee who was Harmon's predecessor in title had actually designated the lines on the ground of the 9.29 acre tract, and by agreement ran the east line of the 9.29 acre tract so as to exclude the disputed tract. The original vendor had later made an agreement respecting the disputed tract whereby one Pool and wife entered upon and took possession of the disputed tract, and built a house thereon, and were occupying such house at the time of trial. This occurred about five years after Harmon had received his deed from one Cohagen, who was the original grantor from Maxwell. Further, Cohagen testified on the trial of the case on cross-examination that he had never claimed title to the disputed tract and had never sold to Harmon. In the Harmon case the original petition only sought recovery of an undivided mineral interest. This Court reversed and remanded the Harmon case. In the case at bar, no one entered the Orsborn inclosure and took possession of the disputed tract. All of the evidence is that J. T. Orsborn from 1919 to his death in 1933 had claimed, cultivated, used and enjoyed the disputed tract, and that from 1933 his heirs, Tom Orsborn, et al, had done the same thing. During all these 32 years no one ever attempted to dispossess the Orsborns of the disputed tract. Furthermore, the Harmon case, (bot, of 2nd. col., p. 460) recognizes the well established rule that a vendee may acquire title by adverse possession of additional or adjoining land outside the limits of the boundaries of his conveyance by having "actual possession of such additional land of such character as of itself will give notice of an exclusive adverse possession and mature into title after the statutory period," and cites an abundance of authority to sustain such statement. I say the evidence in our case, under all the authorities above set out, was at least sufficient to raise a fact issue on the adversity, hostility, claim of right, occupation, use and enjoyment of the disputed tract by the Orsborns; and the respondents are concluded by the trial court's findings of fact and judgment.

The case of West Production Co. v. Kahanek, 132 Texas 153, 121 S.W. 2d 328, is a different fact case than the one

at bar. In the West case, the claimant lived on a tract of land entirely inclosed by a fence and separated from the disputed tract. From 1912 to 1917, when she received the title to her approximately 38 acres homeplace, the disputed tract of 80 acres was "open range country." From 1917, when Dr. Butte built a fence inclosing his pasture of some 10,000 acres and also inclosing the disputed 80 acres, until 1922 there was no fence inclosing the disputed 80 acres, and the court very properly held that claimant was prevented from perfecting a title by adverse claim, use and possession by virtue of Article 5512, Vernon's Annotated Civil Statutes. The disputed tract was not even contiguous to claimant's deeded land, but lay some 400 varas north of the nearest corner. In our case the disputed tract is in the same inclosure with the deed land, and was used in the same manner as the deeded lands. In the West case, supra, a county road ran along the east side of claimant's deeded tract and the west side of the disputed tract. In the case at bar there were no roads through the land. In the West case, even up to the date of trial, the disputed tract was at all times inclosed with other land, and the cattle of others ranged over the disputed tract, and claimant's cattle were not confined to the disputed tract. In the case at bar, livestock of no other persons ranged the disputed tract, and the fences forming the inclosure were sufficient to keep the Orsborn cattle within the inclosure. Even in the West case, the court recognized that after 1929 the possession of the disputed tract, and the use thereof, were sufficient to sustain limitation title. The suit was filed in 1934, so it became necessary to go back of 1929 in order to have the necessary ten years. In the West case the undisputed facts showed that the fences were for the use of others than claimant. In the case at bar none other than the Orsborns were shown to have ever claimed or exercised any control over or repair of the fences.

The case of Primitive Baptist Church at Fellowship v. Fla-Tex Corporation, Tex. Civ. App., 158 S.W. 2d 549 is cited for authority as to use and possession not being adverse. The facts in that case show that the limitation claimant had left gates in his inclosing fences for ingress and egress by the public in using the cemetery located on the disputed tract of land. This clearly showed that the claim asserted was not an adverse one. However, as to that portion of the disputed tract inclosed within claimant's field, the court held an issue of fact was raised, and remanded the cause for trial as to such fact issue. That case most certainly is not authority that Orsborn, as a matter of law, was not entitled to recover in the case at bar.

The case of Allison v. Groppenbacher, et al, Tex. Civ. App., 142 S.W. 2d 528, ref., holds that fact issues were raised by the evidence introduced on the question of adversity, hostility and use of the land, and that the judgment of the trial court, sitting without a jury in favor of appellee, having support in the evidence, was binding. Also, great emphasis is placed on a letter written October 11, 1928 (before the ten-year limitation title could have been perfected) in which claimant, in effect, admitted he did not claim the lands. In the case at bar all the evidence conclusively shows that the Orsborns claimed the disputed tract at all times and there is not a scintilla of evidence that they never claimed the disputed tract.

From all of the above, I believe a fact issue was raised by the evidence in the trial court, and that there is evidence to support the findings and judgment of the trial court, sitting without a jury.

I would, therefore, reverse the judgment of the Court of Civil Appeals, and affirm the judgment of the trial court.

Associate Justices Calvert and Smith join in this dissent.

Opinion delivered March 31, 1954.

Rehearing overruled May 26, 1954.