J. D. WINCHESTER, Appellant,

v.

Henry P. PORRETTO et al., Appellees.

No. 15293.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Sept. 12, 1968.

Rehearing Denied Oct. 3, 1968.

Fuhrhop & Jones, Jerome Jones, Galveston, for appellant.

Markwell, Stubbs, Decker, Dalehite & Youngblood, Theodore B. Stubbs, Galveston, for appellees.

PEDEN, Justice.

Appellant filed this cause seeking title to and possession of certain lots outside of the seawall on Galveston beach, basing his claim on the ten year statute of limitations. He appeals from a summary judgment in favor of appellees.

The narrow question presented on appeal is whether appellant's affidavit, deposition and petition raise a fact issue as to whether his use and possession of the property were such as to constitute adverse possession, an "actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another" which is a necessary element of the ten year limitation statute, Article 5510, Vernon's Civil Statutes, the definition of such term being set out in Article 5515, V.C.S.

In reviewing the deposition and affidavit evidence, all of which comes from the appellant, we will consider that it is true, but will disregard his conclusions of law. In his second amended petition appellant asserts a claim for 33 lots or parts of lots on the beach. His deposition shows that such lots are unmarked and are divided by unmarked public streets, alleys and by other lots into ten tracts. Mr. Winchester testified by deposition that on or about May 1, 1941, he began using the property by placing beach chairs, umbrellas and floats on it, renting them to the public, and selling cold drinks. At various times and places posts have been erected by the County and by appellant at six or seven foot intervals to keep automobiles out of the area, but the general public has always been encouraged to come onto the area; the posts have sometimes been connected by rails, but openings have always been left so that ready access was always available to people on foot.

High tides and storms repeatedly washed away or covered up the posts. In his deposition it is noted:

"Q Now, you have described for us the way in which posts, fences or whatever you call them, would be washed out by high tide and storms. Now, over the years if a fence or row of posts was washed out by a storm or by high water, it would usually stay down or stay washed out until the next spring, is that right?

"A Well, I don't recall the length of time, how long they would stay down or the particular years they were washed out. The fence is washed out right now, it was washed out after—I was away at the time, but I believe it was in October. It's still down, parts of it."

Appellant points out that the lots are not suitable for growing crops or for raising or grazing cattle. Their best use is as a bathing beach, and he has operated his

concession stands in that area for more than ten seasons beginning in the summer of 1941. He states that he has kept the area clean, has not permitted ball playing, has excluded competitors and has ejected those who became unruly or intoxicated. In his affidavit he related that these acts "were calculated to attract and bring as many people to the property as possible, because I was in the business to cater to the public. I also was instrumental in providing safety measures for the protection of swimmers and bathers, in that a lifeguard was installed on a high platform to guard this area. I also provided and had available a first aid kit, and provided solutions for bathers who had been effected by sea nettle, jelly fish and other stinging sea life. I excluded automobiles, obnoxious people, and all other competitors. A number of people came to me to request permission to set up stands and to rent equipment. These, I refused. At all other times, I wanted, and made every effort, to bring as many people to the area as possible. During the summer months I placed over 350 chairs, 100 umbrellas, and numerous portable canvas cabanas, all over the property, and rented such articles, together with inflated floats, to the general public, whom I was attracting to my area. My employees and I cleaned up the area daily and raked it. We also repaired and built equipment for rental. During the off-season, my employees and I kept the area clean and free of logs and raked it with the mechanical rake regularly, though not as often as in the tourist season in the warmer days. I had built a large, heavy stairway from the top of the seawall to the sands below, to provide a safe and convenient access to the property, and many people and children constantly used it."

In his deposition Mr. Winchester testified:

"Q And at all times, as long as you can remember, people can come and go on foot throughout this entire area, isn't that correct?

"A Yes, that's correct.

"Q And in fact, at all times, they have gone all over that beachfront, in the 10th-Street-to-Stewart-Beach line every summer, every winter, every spring and every fall, isn't that right?

"A We have encouraged them to come down there.

"Q And people do enjoy using that beach, isn't that right?

"A Yes.

"Q And they can walk between the posts anywhere they want to go, isn't that right?

"A Yes.

"Q Galvestonians, Texans from the mainland and people from other states, isn't that right?

"A Yes."

His concession stands and equipment shacks (for overnight storage of umbrellas, beach chairs and floats and for their repair were sometimes built on skids so they could be moved; others were built on piling. Mr. Winchester · testified that one such building lasted three of four years, but the others were washed away or broken up by storms in a considerably shorter time. He related:

"Q All right, then when did you build the next one?

"A Well, every year if I was washed out, I mean, I'd have one back. It may not be in the exact location, but there was always a concession stand and equipment stands that were used for the storage of equipment and also maybe one or two small concession stands which were placed on the beach. And their location varied, I mean, as to when I had to rebuild them."

With further reference to the seasonal nature of his use of the area, Mr. Winchester testified by deposition:

"Q ——What do you mean by the expression 'The summer season'?

"A The summer season would be classified as the beginning of the bathing season in the City of Galveston, when people begin to rent the floats and chairs and umbrellas.

"Q And normally that bathing season or summer season, as you have called it, extends through what month of the year?

"A I would say up to October or when the weather begins to get a little cooler.

"Q It normally commences somewhere in the neighborhood of the 1st of May of each year?

"A Yes.

"Q And runs until when?

"A Well, you can't actually set a date. I would say until the cooler weather sets in and people do not go swimming or sun bathing any longer.

"Q And that is normally sometime in October of each year?

"A I would say yes."

" * * *

"Q * * * Now, during the winter months, how does the volume of people using the beach, having picnics and walking up and down, compare with the volume during the summer months?

"A Well, I would say it's practically non-existent except during the summer months.

"Q You don't mean that literally, do you, Mr. Winchester?

"A Yes, I do, except for probably a pretty week end.

"Q All right. On pretty week ends there are lots of people out there, even in November and December, are there not, going all around that beach, looking for sea shells and so forth?

"A It is, now that they can drive down that particular part of the beach.

But up until 1961 when that fence wasn't replaced, they more or less used the other sections of the beach.

"Q How do pedestrians get up and down from the top of the seawall down onto the sand?

"A There are certain intervals steps leading down off of the seawall.

"Q Do you know where those are?

"A From where? Did you want me to—

"Q From 10th Street running east to Stewart Beach.

"A Well, now, some people walk down the groin from the seawall at 10th Street. I believe there is a step about every block from there to Sixth Street. I believe there is three between—three steps between 10th Street Groin and the Seventh Street Ramp.

"Q And a great many people come down onto the beach by foot, do they not?

"A Yes.

"Q And you have no way of knowing whether they have parked cars on the Seawall Boulevard or whether they have tourist accommodations near by or whether they live somewhere in town and have walked out there. Is that a correct statement?

"A Yes.

"Q Now, how does the volume of people vary between winter and summer?

"A You mean the number of people?

"Q Yes, the number of people.

"A Well, that's pretty hard to estimate. I would say from the 1st of May until through Labor Day that the beach, in good weather, when the sun is shining, is used about every day. I can't estimate. I mean, I'm talking about our particular area now, from 10th to Sixth Street. There is a steady volume of

people during the summer months up until Labor Day, then after Labor Day there is quite a few people who use the beach on week ends, Saturdays and Sundays, up until the weather turns bad, which, when it's cooler and they don't go swimming, then I would say that the volume after that time is practically nil except when we have an unusually sunshiny Sunday or—then there is some people down there."

■ Has appellant raised a fact issue as to whether he has for ten years been in open, hostile, exclusive and continuous possession of the lots in question under a claim of right? The claim of right may be manifested by verbal assertion of a claim brought to the knowledge of the landowner. Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781 (1954).

■ In his affidavit appellant states, without referring to any specific lot or lots: "A Mr. James came to me and said I was using his property, and I told him I was claiming it as my own, and would not discontinue the use thereof. This was about the year 1949." We note that two of the parties-defendant are named Robert J. James and Edith James Holbrook McDaniel, but appellant does not indicate that his verbal assertion of claim was made to Robert J. James or to his predecessor in title or to that of Edith James Holbrook McDaniel. We cannot say this raises a fact issue as to an assertion of a claim brought to their knowledge or to the knowledge of their predecessor in title. "If there is no verbal assertion of claim to the land brought to the knowledge of the landowner, the adverse possession must be so open and notorious and manifested by such open or visible act or acts that knowledge on the part of the owner will be presumed. Hopkins v. Waterstreet, Tex.Civ. App., 275 S.W. 303." Orsborn v. Deep Rock Oil Corp., supra.

Appellant does not assert that during the six months or more of each year which are outside the "summer season" he has done anything with respect to the area in question other than to periodically clean it and to do necessary repair or replacement work to any refreshment or equipment stands he had.

There is nothing in the record to show that the cleanup work on the beach was done by anyone who was in uniform or who otherwise gave any indication he was acting for the appellant. Appellant does not assert that he has kept a refreshment or equipment stand or a series of them on the land of any party-defendant for as many as ten years.

The posts that have at various times and places impeded automobile traffic were not alleged by appellant to have borne his name or other indication of any assertion of his claim; some were placed by him, some by the County. They do not deny access to the area. Instead, they make it more inviting to bathers, picnickers and others on foot, who are free to do business with appellant or not as they see fit.

Mr. Winchester has not shown his exclusive possession by seeking to collect an admission charge from each person who entered one of these lots on the beach. He contends that such persons came on the lots as his invitees or customers and were subject to his direction and control. Appellant points out that the exclusiveness of a limitation claimant's possession is ordinarily a jury question and that the character of the land and the uses to which it may be put must be considered in determining such question.

But he does not show that during at least six months of each year his acts performed on the land and his use of it were such as to raise an issue of fact as to whether the owners have been reasonably notified that his claim is hostile. This is the test set out in 2 Tex.Jur.2d, Adverse Possession, § 62, and the cases cited. Although there appears to be so much difference in the number of people who use the beach in the "summer season" as contrast-

ed with the rest of the year that Mr. Winchester chooses to operate a business only during the "summer season", his deposition indicates that on sunny days during other six or seven months people use this beach.

To sustain a plea of limitations in an action to recover land, the claimant must show adverse, continuous and unbroken occupancy of the land for the required period. Snow v. Letcher, 154 S.W. 355 (San Antonio, Tex.Civ.App. 1913, no writ). A break of six months each year does not constitute continuous and unbroken occupancy.

An owner who viewed the land during at least six months of each year would not have fair notice that appellant was asserting a hostile claim.

The judgment of the Trial Court is affirmed.