Opinion issued May 12, 2005






      










In The
Court of Appeals
For The
First District of Texas




NO. 01-03-01060-CV




MASONIC BUILDING ASSOCIATION OF HOUSTON, INC., Appellant

V.

HAL D. McWHORTER AND CHRISTINA McWHORTER, Appellees




On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2001-47992




O P I N I O N

          The Masonic Building Association of Houston, Inc. (the MBA), appellant, sued
Hal D. McWhorter and Christina McWhorter, appellees, seeking to enjoin the
McWhorters from encroaching upon the MBA’s property via a wood fence. The
McWhorters answered and counterclaimed, seeking to quiet title as to the boundary
of the property, and alleging adverse possession for more than ten years. The jury
found that the McWhorters, together with their predecessors in interest, had possessed
the property adversely along the fence line for more than ten years, and the trial court
rendered judgment based on the jury’s verdict. We conclude that sufficient evidence
supports the jury’s adverse possession finding as to the middle section of the existing
fence, but that as a matter of law, the McWhorters did not prove adverse possession
as to the rear section of the fence and as to a hedge boundary because no hostile,
adverse use existed for the requisite ten years. We therefore affirm in part, reverse
and render in part, and remand the issue of attorney’s fees to the trial court.
The Facts
          The property in dispute, located at 32 Pinedale, Houston, Harris County, Texas,
is 116 feet long (north to south) and 4.73 feet wide (east to west), for a total of 576
square feet.


 The disputed property is comprised of three sections: the front, middle,
and rear. In the front section, a planted hedge extends from Pinedale Street to the
front of the house (“the hedge section”). In the middle section, an older wooden
fence runs along the length of the house, from north to south, extending until a line
perpendicular with the front of the garage (“the middle section”). In the rear section,
a newer wooden fence runs along the length of a two-story brick garage to the rear
boundary of the property (“the garage section”). 
          One end of a mechanical iron gate separates the hedge and middle sections. 
The gate runs east to west across the disputed property. This gate weighs about 700
pounds and is covered in wood. The center of the iron gate is attached to an
electronic “arm” or “bar” that connects to an electronic box. When activated by an
automatic opener, the electronic arm opens and closes the gate. The electronic box
and arm, without which the gate could not open, are affixed to the disputed property. 
          In the late 1970’s, David Rubenstein acquired 32 Pinedale from his mother. 
He testified that a wire or cyclone mesh fence existed between his property and the
MBA, which he believed indicated the boundary line. The wire fence had metal posts
and “wire that you can see through.” Rubenstein could not remember the exact length
of the wire fence, but thought it ran “down by the garage,” and not the “whole length
of the property.” In 1985, he removed the wire fence and built a wooden fence along
the existing fence line in the middle section. He also built the mechanical iron gate
in the driveway, and affixed it to the disputed property. Rubenstein maintained the
fence line and the property enclosed within it. Rubenstein testified that he did not
intend to take the MBA’s land, but he did enclose the land and use it. 
          In 1989, Andrew and Catherine Echols purchased 32 Pinedale from
Rubenstein. Andrew Echols testified that, at the time he purchased the property, the
wooden fence ran from the front of the house to the front of the garage–enclosing the
middle section. He assumed the fence line was the boundary between his property
and the MBA. Echols recalled “some sort of plants” in the front of the property, but
he could not remember if the plants were in the same place as the hedges that exist
today. Echols testified that the fence ended at the front of the garage, and that no
fence or enclosure extended along the fence line from the garage to the rear of the
property. Echols maintained the property within the entire boundary line. 
          In February 1993, the McWhorters purchased 32 Pinedale from the Echols for
about $195,000. The McWhorters likewise had no intention to take the MBA’s land.
At the time of purchase, the older wooden fence, built in 1985, remained, enclosing
the middle section. Sometime in 1993, McWhorter extended the fence line by adding
22 feet of a newer wooden fence, enclosing the garage section. He described this
fence as having a “lean-to coming out” of it. 
          In the front section of the disputed property, McWhorter planted a shrubbery
hedge that extends from the wooden fence in the middle section toward Pinedale
Street. He testified that he planted the hedge along an existing shrub line: “Shortly
after we moved in our house in ‘93, it was clear–you could see an existing shrub line
that had been there previous. It was dead.” He explained that “you could trail the
delineating line from the fence line towards the street.” McWhorter asked the MBA
president, Phillip Von Stephens, about planting a new shrubbery line “that would be
a continuation of the boundary line between our two properties.” Von Stephens
agreed and shared in the expenses. In 1998, McWhorter planted additional shrubs
that extended still further along the front of the property up to Barkdull Street. Von
Stephens again agreed that McWhorter could plant the new shrubs. The newer shrubs
extend in a curve to incorporate a large tree. The McWhorters do not claim the
property along the 1998 shrubs, but do claim the hedge section planted in 1993. 
          Paul McGaughy, the McWhorters’ neighbor, lived behind 32 Pinedale for
approximately thirty-three years. McGaughy testified that a wire fence ran along the
rear and middle sections, but he could not remember if it ran along the front section. 
McGaughy testified that Rubenstein removed the wire fence and built a wooden fence
where the wire fence had been, but only in the middle section. Rubenstein never
erected a wooden fence in the garage section to replace the wire fence. McGaughy
further testified that the wire and wooden fences were in plain view, and he believed
that the fence was and is the boundary line between the two properties. 
          The MBA never used nor occupied the land within the wooden fence. In 1997,
the MBA negotiated with a nearby church to sell its parking lot property. A survey
of the property indicated that the McWhorters’ fence encroached onto the MBA
property. The MBA demanded that the McWhorters remove the fence, and the
McWhorters refused. 
The Procedural History
          In September 2001, the MBA sued the McWhorters, seeking a permanent
injunction requiring that the McWhorters remove the fence and other encroachments
from the property, and seeking rents and attorney’s fees. The McWhorters filed an
answer and counterclaim, seeking ownership of the property and alleging adverse
possession of it for more than ten years. The MBA specially excepted to the
McWhorters’ counterclaim, asserting that the McWhorters did not properly plead a
trespass to try title claim. On May 1, 2002, the trial court granted the MBA’s special
exceptions, and ordered that the McWhorters replead. On September 2002, the
parties agreed to a continuance, in hope of reaching an out-of-court resolution. The
parties did not settle, and the McWhorters filed second and third amended answers,
neither containing any legal description of the property. 
          At trial, the jury found that the McWhorters, and their predecessors in privity
of estate, adversely possessed the entire property in dispute, including the hedge, the
middle, and the garage sections. The trial court rendered judgment on the jury’s
verdict.
Failure to Plead a Description of the Property
          At the outset, the MBA contends that the McWhorters failed to plead a legal
description of the disputed property by metes and bounds. On June 16, 2003, during
a pretrial conference, the McWhorters offered defendants’ exhibits 3 and 4, that
contained survey drawings and a metes and bounds legal description of the property. 
The MBA objected on the grounds that, in a trespass to try title suit, a plaintiff must
include in the petition a “description of the premises by metes and bounds, or with
sufficient certainty to identify the same, so that from such description possession
thereof may be delivered.” Tex. R. Civ. P. 783(b). The McWhorters’ live pleading
at that time, their third amended answer, did not include such a description.
          The trial court overruled the objection and granted the MBA a running
objection. The McWhorters sought, and the trial court granted, leave to amend their
pleadings. The trial court also granted a continuance to the MBA until June 23, 2003,
to permit those involved in the trial to attend a funeral. On June 17, 2003, the
McWhorters filed a fourth amended answer that included legal descriptions of the
property. The court called the case to trial on June 23, 2003. 
          Under Texas Rule of Civil Procedure 63, parties must amend their pleadings
seven days before trial, unless the trial court grants leave to amend. See Tex. R. Civ.
P. 63. The McWhorters assert that, due to the trial continuance, they timely filed their
Fourth Amended Petition seven days before trial, in accordance with Rule 63. The
Texas Supreme Court, however, has applied Rule of Civil Procedure 4 to the
computation of the time constraints in Rule of Civil Procedure 63. Sosa v. Cent.
Power & Light, 909 S.W.2d 893, 895 (Tex. 1995). Rule 4 provides that the first day
of a time period is not to be counted, but the last day of the period is to be included
unless it is a Saturday, Sunday, or legal holiday. Tex. R. Civ. P. 4.



          Here, the McWhorters amended their pleading on Tuesday, June 17, 2003, and
trial began on Monday, June 23, 2003. Under Rule 4, we do not count the day the
McWhorters amended their pleading. See Id.; see also Sosa, 909 S.W.2d at 895. The
trial began on the sixth day from the date of the filing, one day too soon. See Tex. R.
Civ. P. 63. 
          Although the McWhorters did not file their amended pleading within the period
prescribed by Rule 63, the McWhorters requested, and the trial court granted, leave
to amend the pleadings. See Id. Under our rules, a trial court shall grant leave to
amend the pleadings, unless the filing operates to surprise the opposing party. Id. 
Construing Rule 63, the Texas Supreme Court has held that “[a] court may not refuse
a trial amendment unless (1) the opposing party presents evidence of surprise or
prejudice, or (2) the amendment asserts a new cause of action or defense, and thus is
prejudicial on its face.” State Bar of Texas v. Kilpatrick, 874 S.W.2d 656, 658 (Tex.
1994) (citing Greenhalgh v. Serv. Lloyds Ins. Co., 787 S.W.2d 938, 939 (Tex. 1990)). 
Moreover, the burden of showing surprise or prejudice rests on the party resisting the
amendment. Id. (citing Greenhalgh, 787 S.W.2d at 939). We review the trial court’s
ruling under an abuse of discretion standard. Id.
          The MBA contends that it was surprised by the amended petition because it did
not know whether the McWhorters sought the hedge, middle, or rear sections of the
property by adverse possession. In its first amended answer, however, filed over sixty
days before trial, the MBA asserted a defense that the “rear” and “hedge” portions of
the fence had not been in place in excess of ten years. The pleading thus indicates
that the MBA knew that the McWhorters claimed a right to title of the entire fence
line boundary, including the hedge and rear sections. Moreover, the parties together
hired and designated an expert surveyor, Ernest Roth, who prepared a survey and
metes and bounds description of the disputed property. Based on this common
expert, the pleadings, and the apparent location of the fence, hedge, and garage, the
trial court did not err in refusing to heed the MBA’s claim of surprise. 
          In Vargas v. Vaca, the San Antonio Court of Appeals held that a trial court did
not abuse its discretion in allowing a trial amendment that contained a sufficient
description of the disputed land by metes and bounds, because the parties were aware
of the disputed strip of land and of its location. 376 S.W.2d 65, 66 (Tex. Civ.
App.—San Antonio 1964, no writ); see also Sterling v. Tarvin, 456 S.W.2d 529, 536
(Tex. Civ. App.—Fort Worth 1970, writ ref’d n.r.e.) (allowing plaintiffs to amend
petition before announcing ready for trial because land description was “obvious” and
amendment did not surprise parties). For similar reasons, we hold that the trial court
did not abuse its discretion in allowing the trial amendment. 
Sufficiency of the Evidence
          The MBA next contends that the evidence of adverse possession is legally and
factually insufficient to support the jury’s verdict. A party seeking to establish title
to land by adverse possession has the burden to prove every fact essential to that
claim by a preponderance of the evidence. Rhodes v. Cahill, 802 S.W.2d 643, 645
(Tex. 1990). In reviewing a legal-sufficiency point, we consider all of the evidence
in the light most favorable to the party in whose favor the verdict was rendered, and
we indulge every reasonable inference from the evidence in that party’s favor. 
Formosa Plastics v. Presidio Eng’rs, 960 S.W.2d 41, 48 (Tex. 1998). Anything more
than a scintilla of evidence is legally sufficient to support the finding. Id. In
reviewing a factual-sufficiency point, we consider all the evidence supporting and
contradicting the finding. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445
(Tex. 1989). We set aside the verdict only if the finding is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
Adverse Possession
          Adverse possession is “an actual and visible appropriation of real property,
commenced and continued under a claim of right that is inconsistent with and is
hostile to the claim of another person.” Tex. Civ. Prac. & Rem. Code Ann.
§ 16.021(1) (Vernon 2002); Rhodes, 802 S.W.2d at 645. A person must bring suit no
later than ten years after the day the cause of action accrues to recover real property
held in peaceable and adverse possession by another who cultivates, uses, or enjoys
the property. Tex. Civ. Prac. & Rem. Code Ann. § 16.026 (Vernon 2002). 
          The test for hostility is whether the acts performed by the claimant on the land
and the use made of the land were of such a nature and character as to reasonably
notify the true owner of the land that a hostile claim was being asserted to the
property. Winchester v. Porretto, 432 S.W.2d 170, 174–75 (Tex. Civ.
App.—Houston [1st Dist.] 1968, writ ref’d n.r.e.). Adverse possession does not have
to continue in the same person if privity of estate exists between each holder and his
successor. Parker v. McGinnes, 842 S.W.2d 357, 360 (Tex. App.—Houston [1st
Dist.] 1992, writ denied). The McWhorters therefore must be in privity of estate with
their previous owners in order for the ten-year limitations period to tack from one
owner to another. See Tex. Civ. Prac. & Rem. Code Ann. § 16.023 (Vernon 2002). 
The Intent to Appropriate
          The MBA contends that the evidence is legally and factually insufficient to
support the verdict because the McWhorters and their predecessors in interest
testified that they did not “intend to take” the MBA’s property. The MBA relies on
Ellis v. Jansing, in which the Texas Supreme Court held:
Mere occupancy of land without any intention to appropriate it will not
support the statute of limitations. No matter how exclusive and hostile
to the true owner the possession may be in appearance, it cannot be
adverse unless accompanied by the intent on the part of the occupant to
make it so. The naked possession unaccompanied with any claim of
right will never constitute a bar.
620 S.W.2d 569, 571–72 (Tex. 1981) (citations omitted).


 
          To understand the holding in Ellis, one must understand its facts. Ellis
involved a tract of land divided into lot 3 to the west and lot 4 to the east. Id. at 569. 
A. B. Shoemake was the common source of title to both tracts. Id. In 1937,
Shoemake dedicated a fifteen-foot easement to the City of Waco for a storm sewer. 
Id. The easement ran along the western boundary of lot 4 and joined the eastern
boundary of lot 3. Id. After dedicating the easement, Shoemake built a concrete
retaining wall on lot 4, located three-and-one-half feet east of the easement’s east
boundary. Id. A four-foot chain link fence topped the retaining wall, which extended
two to three feet above the easement. Id. at 569-70. 
          The Jansings, the owners of lot 3, sought adverse possession from Ellis and
McDonald, the owners of lot 4, of both the easement and the three-and-one-half foot
strip of land that ran between the easement and the concrete wall. Id. at 571. The
Texas Supreme Court held that the Jansings could not adversely possess the easement
because it was dedicated to public use by statute. Id. at 570. With respect to the
additional strip of land, Copeland, the Jansings’ predecessor in title, had removed a
flower bed next to the concrete wall, planted grass, and maintained the disputed strip. 
Id. Copeland testified that he took possession of the land assuming that the concrete
wall was the boundary line between lots 3 and 4. Id. He further testified that,
although he had assumed that he owned the disputed strip, he did not intend to claim
any property that belonged to the abutting property owners of lot 4. Id. 
          The Texas Supreme Court held that Copeland did not have the intent to
appropriate the land from the true owner. Id. Even though Copeland had maintained
the land and treated it as his own, “the Copeland’s yard was never fenced, and
entrance onto the easement and adjoining strip between the easement and retaining
wall was not obstructed.” Id. Moreover, Copeland testified that he never claimed or
intended to claim any property owned by the abutting property owners. Id. The court
held that these facts were legally insufficient to sustain a claim of adverse possession. 
Id. 
          The Jansing’s reliance on Shoemake’s concrete wall in Ellis is distinguishable
from the McWhorter’s reliance on the Rubenstein’s fence in this case. In Ellis,
Shoemake, the common source of title to both lots 3 and 4, built the concrete wall, the
only barrier or obstruction ever erected on the land. See id. A landowner may fence
part of his property, but in so doing, he does not disclaim or negate his ownership of
his property outside the fenced area. See Cox v. Olivard, 482 S.W.2d 682, 685-88
(Tex. Civ. App.—Dallas 1972, writ refused n.r.e.) (holding that landowner, who
placed his fence east of true boundary line due to nature of terrain, did not relinquish
rights to his land west of fence, when adjoining property owner occasionally grazed
cattle in disputed area). Shoemake’s concrete wall, which he built on his own
property, therefore was not a hostile use. Once Shoemake divided title to the
property, no owner of lot 3–including the Jansings–ever obstructed, fenced, or
otherwise used the land in a manner inconsistent with or hostile to the owner of lot
4. See Ellis, 620 S.W.2d at 571. Thus, the Jansings’ reliance on Shoemake’s
concrete wall, which was not a hostile use of the property at its inception, was legally
insufficient to constitute adverse possession. See id.


 
          Here, Rubenstein was not a common source of title of land on both sides of the
fence. Rubenstein did not own the MBA land at the time he erected the fence and
enclosed the property to the exclusion of the MBA’s use. He built the fence for
privacy and to exclude “late night” activity that occurred on the MBA parking lot. 
He never contacted anyone at the MBA about his replacement of the cyclone fence
with the wood fence. His erection of a fence therefore was a hostile use of his
neighbor’s property. See King v. Inwood N. Assocs., 563 S.W.2d 309, 312 (Tex.
App.—Houston [1st Dist.] 1978, no writ) (noting fact that adverse possessors’
mistaken belief that they owned land in controversy did not defeat claim). 
          Here, for over ten years, the MBA did not assert its legal right to the disputed
property, and evidence exists that the predecessors in title intended to claim the
property as their own. All the parties involved–the MBA, the McWhorters, the
predecessors in interest, and the neighbor–believed that the fence line was the
boundary between the two properties. Although the McWhorters did not “intend to
take” the MBA’s property because they thought that they rightfully owned the land,
the Rubensteins, the Echols, and the McWhorters intended to use the property
exclusively as their own–and did use it to the exclusion of the MBA with respect to
the middle section. Moreover, even though they may not have consciously intended
to deprive the MBA of its title to the land, both the Echols and the Rubensteins
intended to convey the disputed land to their successor in interest. As Mr. Rubenstein
testified, “I thought that I was selling them [the Echols] the property, and I assumed
that the fence was on the property.” Mr. Echols similarly agreed that he and his wife
claimed ownership of the disputed property and intended to transfer to the
McWhorters “the fence, and all of the land that was within the fence.” The jury could
have concluded, based on the evidence of the hostile fence that excluded use of the
land by the MBA, and the evidence of the predecessors’ intent to convey the area
within it to a third party, that the predecessors in title did indeed intend to exercise
rights to the property that were inconsistent with that of the true owner. We hold that
legally and factually sufficient evidence supports the jury’s finding of an intent to
appropriate. See Calfee, 544 S.W.2d at 642.
The Middle Section
          The wooden fence that Rubenstein built in 1985 existed along the middle
section of the boundary, enclosing the disputed land within it for over ten years. It
is undisputed that Rubenstein installed the 700-pound, mechanical iron gate in 1985. 
The electronic box and arm to the mechanical gate, without which the gate could not
open, are located in the middle section of the property. The use of the disputed strip
within the fence was to the exclusion of the MBA’s use of the land for more than ten
years. We thus hold that the evidence is legally and factually sufficient to support the
jury’s verdict of adverse possession with regard to the middle section of the property.
The Garage Section
          The MBA contends that the evidence is legally and factually insufficient to
support the jury’s verdict with regard to the garage section. We agree. In 1993,
McWhorter added 22 feet of wooden fencing in the rear section running along the
garage. It was undisputed at trial that the fence along the garage had not existed for
the requisite ten years. 
          The McWhorters contend that a wire fence had existed previously along the
location of the disputed boundary line, but could offer no evidence at trial to support
this contention. Rubenstein could not remember the length of the wire mesh fence
that had existed before 1985. It was undisputed at trial, moreover, that Rubenstein
removed this wire fence and replaced it with a wooden fence along the existing fence
line in 1985, but only as to the middle section. McGaughy, the neighbor, concurred
that Rubenstein removed the wire fence, built a wooden fence in the middle section
only, and did not erect a wooden fence in the garage section: 
A.What you see as red brick behind the fence, which is a garage. 
Left that exposed, and ground-in dirt and grass or weeds up to the
building.
 
Q.So no wooden fence was here, in your observation, when the wire
mesh fence went down. The wire mesh fence went down, and no
wooden fence was re-erected then; correct?
 
A.There was no wooden fence erected, that’s right. 

Echols similarly testified that Rubenstein’s 1985 wooden fence ended at the front of
the garage, and “there was no fence that extended from the garage” to the rear of the
property. 
          Regardless of whether a wire fence ran along the garage section at some time
before 1985, the testimony is consistent that Rubenstein tore it down in 1985 and did
not erect a new fence along that section. The garage wooden fence section did not
exist until McWhorter built it in 1993, and thus ten years did not elapse before the
MBA brought suit in 2001. Although the evidence indicates that all of the
predecessors in title cut the grass and maintained the disputed area along the garage
section, this evidence is not legally sufficient for adverse possession. See Bywaters
v. Gannon, 686 S.W.2d 593, 595 (Tex. 1985) (holding that mowing grass, planting
flowers, and maintaining hedges are not sufficient hostile acts for adverse
possession). Thus, no evidence supports the jury’s conclusion that the McWhorters
adversely possessed the garage section of the property with any “actual and visible
appropriation of real property.” See Tex. Civ. Prac. & Rem. Code Ann.
§ 16.021(1).
          The McWhorters respond that the middle fence “marked the boundary line, and
the front and rear portions of the fence were simply continuations of that boundary
line.” They rely on Yates v. Hogstrom for the proposition that “a line may be
established as a true boundary line of a tract of land by recognition and acquiescence
in the line as the true line by all interested parties for a sufficient length of time.” 444
S.W.2d 851, 853 (Tex. Civ. App.—Houston [14th Dist.] 1969, no writ). Yates is
distinguishable because, in that case, the “boundary line” was an actual fence that had
existed for ten years. Id. at 852. Here, neither a fence nor any other sort of
obstruction separated the garage section from the remainder of the MBA’s property
for the requisite ten years. 
          The McWhorters also rely on the ranching case of Fish v. Bannister, 759
S.W.2d 714 (Tex. App.—San Antonio 1988, no writ). Fish is likewise
distinguishable because a fence separated the Fish and Bannister ranches for more
than fifty years. Id. at 716. The McWhorters cite no other case law to support their
contention that a hypothetical continuation of an existing fence line–as opposed to
an actual fence–is legally sufficient to establish adverse possession. We hold that
legally insufficient evidence supports the McWhorters’ claim for adverse possession
of the garage section. 
The Hedge Section
          The MBA contends that the evidence is also legally and factually insufficient
to support the verdict with regard to the hedge section at the front of the property. 
We agree. The MBA relies on Bywaters v. Gannon, in which the Texas Supreme
Court held that “[s]ince mowing the grass and planting flowers does not constitute a
hostile character of possession sufficient to give notice of an exclusive adverse
possession, it stands to reason that maintaining a hedge does not either.” 686 S.W.2d
at 595. 
          The McWhorters respond that, in Julien v. Baker, the Fourteenth Court of
Appeals held that “planting a hedge” to create a barrier or fence–as opposed to
“maintaining a pre-existing hedge”–is a sufficiently permanent, visible and
unequivocal act to evidence a hostile character of possession, to give notice to the
true owner of the claimant’s adverse possession. 758 S.W.2d 873, 876 (Tex.
App.—Houston [14th Dist.] 1988, writ denied). 
          Julien is distinguishable because in that case the property owner planted the
hedge more than ten years before the suit. Id. Here, the McWhorters concede that
they did not plant the existing hedge until sometime in 1993–and whatever it replaced
was gone or dead. Thus, even if a hedge could constitute evidence of a permanent,
hostile use, in circumstances that are distinguishable from Gannon, we need not
decide that here, because the hedge in this case did not exist for the requisite ten
years.


 
          As they do with the garage section, the McWhorters similarly contend that the
hedge is a continuation of the middle fence line boundary, which existed for the
requisite time frame. The McWhorters cite no case law to support that a continuation
of a hypothetical fence line, as opposed to an actual fence or other obstruction, is
sufficient to establish adverse possession. We therefore hold that, as a matter of law,
the McWhorters did not establish a claim for adverse possession of the hedge section.Jury Charge
          The MBA contends that the trial court erred in charging the jury. The MBA
objected to jury charge questions 1(a), 1(b), and 1(c) because those questions
included property descriptions that the McWhorters did not timely plead. The trial
court overruled the MBA’s objections. As set forth above, we hold that the trial court
did not abuse its discretion in granting the McWhorters leave to amend their
pleadings to include legal descriptions of the property. Accordingly, we hold that the
trial court did not err in including those property descriptions in the jury charge.
Attorney’s Fees
          The McWhorters and the MBA stipulated that they would submit the issue of
attorney’s fees to the trial court if the MBA prevailed. “In a suit for the possession
of real property between a person claiming under record title to the property and one
claiming by adverse possession, if the prevailing party recovers possession of the
property from a person unlawfully in actual possession, the court may award costs
and reasonable attorney’s fees to the prevailing party.” Tex. Civ. Prac. & Rem.
Code Ann. § 16.034 (Vernon 2002). We hold that the MBA has prevailed with
regard to the garage and hedge sections of the property; therefore, we remand the
issue of attorney’s fees to the trial court.


 
Conclusion
          We hold legally and factually sufficient evidence supports the jury’s finding
that the McWhorters acquired title by adverse possession to the middle section of the
property. We therefore affirm the judgment of the trial court with respect to that
boundary. We hold that the evidence is legally insufficient to support a claim of
adverse possession as to the hedge and garage sections of the disputed property
because no evidence supports the jury’s finding that the McWhorters and their
predecessors in title appropriated the property in an actual and visible manner, 
hostile to that of the true owner, for more than ten years. We therefore reverse the
judgment of the trial court with regard to the hedge and garage sections of the
property and render judgment in favor of the MBA. We remand the cause to the trial 
 

court for entry of judgment consistent with our decision, and to determine the issue
of attorney’s fees. 
 

                                                             Jane Bland
                                                             Justice
 
Panel consists of Justices Taft, Jennings, and Bland.