Opinion filed August 18,
2011

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00250-CV 

                                                    __________

 

                 SUSAN G.
REID AND GERALD R. REID, Appellants

 

                                                             V.

 

                        CHARLES
HUTTON, LAFREITA HUTTON, 

               GARY HUTTON,
AND JIMMY HUTTON, Appellees



 

                                    On
Appeal from the 91st District Court

 

                                                           Eastland
County, Texas

 

                                               Trial
Court Cause No. CV-07-40750 

 



 

                                             M
E M O R A N D U M  O P I N I O N

Appellees
Charles Hutton and his wife, Lafreita Hutton, and his sons, Gary Hutton and
Jimmy Hutton, filed this suit claiming title to an area in the southwest corner
of the adjacent tract owned by appellants, Susan G. Reid and her husband,
Gerald R. Reid.  The Huttons’ claim was based solely on the ten-year statute of
limitations.  Tex. Civ. Prac. & Rem.
Code Ann. § 16.026(a) (Vernon 2002). After a bench trial in February
2009, the trial court rendered judgment for the Huttons.

The
requirements of the statute were not met.  It is unclear from the petition, the
evidence, and the judgment where all of the boundaries of the claimed area are. 
Before issuing its ruling, the trial court stated on the record that it did not
know whether a judgment could be crafted unless or until a survey of the area
was made.  The Huttons testified that they were claiming about one-third or
one-half an acre.  The trial court also was concerned about whether the
requirement of notice to the record holder had been met.  We hold that it was
not.  The Huttons’ evidence was legally insufficient to show open or visible
acts manifesting an intention to claim the land adversely.  See Orsborn v.
Deep Rock Oil Corp., 267 S.W.2d 781, 787-88 (Tex. 1954).  We reverse and
render judgment for the Reids.

Background
Facts

            The
Huttons acquired a 326.285-acre tract of land from B. E. Hanson and his wife,
LaRue Hanson, by warranty deed dated March 12, 1985.  In April 2005, the Reids
acquired the adjoining tract of 239.94 acres by warranty deed from Martha Julie
Gilbert.  Both deeds contain detailed descriptions by metes and bounds of the
respective tracts.  The Huttons acknowledged at trial and in their brief to
this court that the area they claim is contained within the description of the
tract in Gilbert’s deed to the Reids.

            The
parties do not live on their respective tracts.  The Reids live in Spicewood,
and the Huttons live in Weatherford.

            The
testimony of the Huttons concerning the area claimed was very confusing.  Often
they were referring to exhibits, and it was impossible to tell which exhibit or
to what part of an exhibit they were discussing.  The Huttons stipulated during
trial that there was no metes and bounds description or survey of the area claimed. 
Nor did they introduce a drawing of the area as an exhibit.  Much of their
testimony concerned a gate used by the Huttons on the Reids’ southern boundary
for access from county road 358 and the Huttons’ and their hunters’ use of an
abandoned railroad right-of-way as a road to a gate in the boundary fence
between the respective tracts of the Huttons and the Reids.  The Huttons
offered no complete and clear testimony as to how the area was enclosed except
to say that it was enclosed at the time they purchased their property.[1]

There
is an abandoned railroad right-of-way located across the southwest corner of the
Reids’ tract that the Huttons claim they have used as the primary access road to
their 326.285 acres for over ten years.  In their petition, the Huttons claimed
that they maintained a fence and gate that was actually on the Reids’
property.  We assume they were referring to the southern fence on the Reids’
property that parallels county road 358. 

Charles
Hutton testified that they used the gate on the Reids’ property on the county
road and then drove northwest on the abandoned railroad right-of-way to go to
their land where there was another gate.  When asked what was across the
railroad right-of-way before Susan Reid removed the existing boundary fence and
then built a new boundary fence (according to the Reids’ survey), Charles
testified that there was a metal gate that was there when they purchased the
property.  Both Charles and Gary Hutton testified that the fence and gate
separating the respective tracts were in existence when they purchased their
tract of land.  That fence and gate and the new fence built by the Reids were
the west boundary of the Reids’ tract and the east boundary of the Huttons’
tract.

            Before
the Reids built a new boundary fence between their tract and the Huttons’ tract,
there was a fire in 2006 that burned the old boundary fence posts.  Charles
Hutton admitted that, after the fire, Susan Reid asked him to share the cost of
a new fence between them.  He declined to do so because he did not want to pay
for a fence that kept him from using the gate on the Reids’ property to access
county road 358.  When the Reids built the new boundary fence without a gate to
the Huttons’ tract, Charles Hutton and his son, Gary, took down a portion of that
fence even though Charles admitted that the fence built by the Reids went down
the boundary survey line.

            Charles
Hutton was asked if, after the fire had damaged the boundary fence, there was
“a problem with the condition of the fence that would allow [his] cattle to
roam off [his] property.”  He said that there was and that they put their
cattle on another piece of property to the west.  His attorney then asked if he
had ever seen the Reids’ cattle “out there.”  Charles Hutton replied that he
had seen the Reids’ cattle “out there” one time.  In the context of that
portion of his testimony, it appears that Charles Hutton was talking about the
southwest corner of the Reids’ property.  

The
southern border of the Huttons’ tract also runs along county road 358.  Gary
Hutton acknowledged that other entrances could have been built on their land.  Charles
Hutton testified that there was another entrance to their property from county
road 358 that was “in the center” “[o]n the south side, off the county road” and
a second entrance that was at the southwest end of their property.  He
described the fence line and “the gate entrance in the middle of the south side
of [his] property.”[2]


            Charles
Hutton acknowledged that the fence and gate on the Reids’ land and the  boundary
fence and gate between the respective tracts were in existence when they bought
their 326.285-acre tract.  He testified that purchasers of rock from the rock quarry
on their land used the two gates to drive on the railroad right-of-way to their
land.  He said that the rock was used to build Lake Proctor in Comanche County
which was completed long before the Huttons bought their tract.  After they
bought their tract, the Huttons continued to sell remnants from the rock quarry,
and the railroad right-of-way road was used to haul the rock. 

            Susan
Reid testified that she contacted the Huttons shortly after the Reids purchased
their property and had it surveyed.  She wanted to explore with her neighbors a
joint fencing of the boundaries.  According to her, all the fences, including
cross-fences, were in terrible shape.  When she visited with the Huttons, she
told them that she knew they were using part of her property to get to their
land, but they needed to change to another entrance because she planned to
eliminate the gate in the fence going into their land.  She said that, although
she advised the Huttons of her intent to replace the old boundary fence between
their respective tracts, she gave the Huttons permission to continue crossing her
land until her fencing was completed.

            According
to Susan Reid, Gary Hutton came to see her and told her that the Huttons would pay
her $500 for the area with the railroad right-of-way road.  Susan said that Gary
based the offer on what the Reids had paid for their tract.  She also said that
Gary kept telling her that he had gone across the property for many years, and
they hoped the Reids “wouldn’t not fence them in.”  Later, Gary was asked by
his counsel, “Did you say anything about making an offer to her to pay the cost
of a survey, or closing costs, or her attorney’s fees to buy that corner?”
His answer was, “Well, I had said I would cover those costs.”  Also, in their
answer to Request for Admission No. 6 of the interrogatories, the Huttons
admitted that one or more of them had “offered to purchase the disputed
one-half acre, more or less, from [the Reids] prior to the fencing dispute.”  The
fencing dispute occurred after Susan Reid built the new boundary fence.   

            Susan
Reid testified that neither Charles Hutton nor Gary Hutton ever told her that
they claimed ownership of part of her land before they filed suit.  Susan said
she made it clear to the Huttons at all times that the Reids were going to
build the new fence down the survey line between the two properties.

Charles
Hutton admitted that he never told Susan Reid that he claimed ownership of a
part of her land.  Charles testified that he started claiming ownership of the
area when he “first started going through it 24 years ago.”  When asked to whom
he stated his claim, Charles answered, “The people that I bought the property
from.”  Gary Hutton testified that the first time he gave the Reids formal
notice that the Huttons were claiming the area was when they talked to their
lawyer in Weatherford.

Susan’s
husband, Gerald Reid, testified that when Gary Hutton met with Susan to discuss
the Reids’ southwest corner, he and Charles Hutton were there but were discussing
an old tractor on the Reids’ tract.  Afterwards, “Susan relayed to [her
husband] that there was an offer of $500 for the property, a willingness to pay
for any re-survey and/or plat, or local fees to get the property transferred
into their title.”  Gerald stated that the Huttons never claimed to own the
property, but it was his impression that the Huttons had used that entrance
over the years by permission.  Susan testified that she had a key from Gilbert
to the gate into the Reids’ property from county road 358 and that she had gone
through that gate several times.

            After
a bench trial, the trial court rendered judgment for the Huttons.  However, the
trial court had difficulty in identifying the boundaries of the property that the
Huttons claimed they owned by adverse possession.  The trial court attempted to
solve that problem by attaching copies of three exhibits to the judgment.  The
attached exhibits do not provide a  sufficient description of the claimed
area.  From the record, this court is unable to tell the northern boundary or
boundaries of the claimed area.  Nor are we able to tell how far to the east on
the Reids’ land the Huttons were claiming.

Requirements
of a Trespass to Try Title Suit

            When
a party claims title by adverse possession, the claim may be resolved only in a
statutory trespass to try title action.  Martin v. Amerman, 133
S.W.3d 262, 267 (Tex. 2004); Ruiz v. Stewart Mineral Corp., 202
S.W.3d 242, 247 (Tex. App.—Tyler 2006, pet. denied); Ely v. Briley, 959
S.W.2d 723, 727 (Tex. App.—Austin 1998, no pet.).  A trespass to try title
action is a procedure by which rival claims to title or right of possession may
be adjudicated.  Tex. Prop. Code Ann. § 22.001(a)
(Vernon 2000); King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 755
(Tex. 2003); Ruiz, 202 S.W.3d at 247.  Although the Huttons’ petition did
not state that the suit was a trespass to try title action, we will assume that
it was.

Adverse
possession is one method of proving title in a trespass to try title action.  Rogers v.
Ricane Enters., Inc., 884 S.W.2d  763, 768 (Tex. 1994).  To recover
in a trespass to try title action, the plaintiff must recover upon the strength
of his own title.  Id.  One seeking to establish title to land by virtue
of the statute of limitations has the burden of proving every fact essential to
that claim by a preponderance of the evidence.  Rhodes v. Cahill, 802
S.W.2d 643, 645 (Tex. 1990).  And, inferences are never indulged in the
adverse claimant’s favor.  Bywaters v. Gannon, 686 S.W.2d 593, 595
(Tex. 1985).  

Adverse
possession is “an actual and visible appropriation of real property, commenced
and continued under a claim of right that is inconsistent with and is hostile
to the claim of another person” throughout the statutory period.  Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1)
(Vernon 2002).  The statute requires that such possession be “inconsistent
with” and “hostile to” the claims of all others.  Tran v. Macha, 213
S.W.3d 913, 914 (Tex. 2006).  The adverse possession claimant also has the
burden of identifying the tract that he claims; judgment for the record owner
is proper if the claimant fails to do so.  Coleman v. Waddell, 249
S.W.2d 912, 913 (Tex. 1952); Julien v. Baker, 758 S.W.2d 873, 877 (Tex.
App.—Houston [14th Dist.] 1988, pet. denied).

Analysis

In
Issues 2, 4, and 5, the Reids argue that the trial court erred in rendering
judgment for the Huttons because (a) the Huttons failed to meet the burden of
proof necessary to sustain an adverse possession claim under the ten-year
statute of limitations, (b) the evidence presented by the Huttons was legally insufficient
to support the judgment, and (c) the evidence presented by the Huttons was
factually insufficient to support the judgment. 

In
their reply brief, the Huttons first assert that they claimed “[t]he Southeast
corner, comprised of approximately one-half (1/2) acre (the ‘Disputed Property’),
is the subject of this appeal.”  The record reference cited for a description
of the claimed area is a statement by the Reids’ counsel to the court, at the
beginning of the trial, asking the court to take notice that “there is a legal
description of the area that’s in dispute.  It’s generally as a tract of a half
acre, more or less.”  But it is apparent that counsel meant to say that there
was not a legal description of the claimed area because his next
sentence advised the court, that “There is no metes and bounds description of
that property, and there is insufficient description of that property for the
court to enter a judgment in this matter.”  From the beginning of the trial,
the Reids have taken the position that the area claimed was insufficiently
described.  

It
is evident from the record that the claimed area was in the southwest corner of
the Reids’ property, which was next to the southeast corner of the Huttons’
property.  Although two boundaries were identified – the Reids’ southern fence
along county road 358 and the fence between the respective tracts – the
remaining boundary or boundaries were not.

Charles
Hutton testified that the claimed area was “[a] very small piece of land,”
about “a third to half an acre.”  In their brief, the Huttons point to the
Reids’ Exhibits Nos. 6, 7, 11, and 12 as showing the disputed area.  One can
see the old railroad right-of-way line on those exhibits, but the only
discussion of that line by the Huttons was Charles’s testimony that the line
was the abandoned railroad right-of-way that crossed the county road and went
into the Huttons’ property.  However, there was no evidence or testimony as to
how much property on the north side of the right-of-way road the Huttons were
claiming or how far to the east of the Reids’ gate to county road 358 they were
claiming.

Susan
Reid did testify that there was an old fence near the right-of-way road that
their predecessors in title probably erected to keep cattle off the railroad,
but that “it was very old and it was not much of a fence.”  The only other
reference to a fence north and parallel to the old railroad right-of-way were
questions to Gary Hutton concerning how old the fence was.  He also testified
that the fence was old and had been there a long time.  He said that he had
repaired it at some point.  The exhibit attached to the judgment shows a line
north of what we assume to be the railroad right-of-way, but (assuming that it was
a fence) that line turns from being parallel to the right-of-way and goes east
to the east boundary of the Reids’ property.  There also is a dotted line that
may be the fence they were talking about.  The claimed area cannot be
identified with reasonable certainty.

The
Huttons stated several times that the area was enclosed, but admitted that they
had not enclosed the claimed area.  The record does not clearly reflect how the
area was enclosed.  It does appear from Gary Hutton’s brief reference that the
Huttons were relying on an old fence near the railroad right-of-way referred to
by Susan Reid.  If that was a boundary, that fence was a casual fence.

Actual
and visible possession can be established by a “designedly enclosed” fence, but
not by a casual fence.  Orsborn, 267 S.W.2d at 785-88; Myers v.
Wright, 224 S.W.3d 466, 469 (Tex. App.—Dallas 2007, no pet.).  Where
a fence existed prior to the adverse claimant’s possession of the land and the
claimant fails to demonstrate the purpose for which the fence was erected, the
fence is a casual fence.  Myers, 224 S.W.3d at 469; Mohnke v.
Greenwood, 915 S.W.2d 585, 593 (Tex. App.—Houston [14th Dist] 1996, no
writ). 

A
claimant may substantially modify a casual fence and so change its character
that the fenced-in area becomes a designed enclosure, Rhodes, 802 S.W.2d
at 646, but there was only the brief testimony by Gary Hutton that he had
repaired that fence.  There was no evidence that the Huttons had done anything
to modify that fence.  Repairing or maintaining a casual fence, even for the
express purpose of keeping the claimant’s animals within the enclosed area,
generally does not change a casual fence into a designed enclosure.  Rhodes,
802 S.W.2d at 646. 

The
Huttons agree that, when a claimant relies on cattle grazing to establish title
through adverse possession, he must present evidence that he “designedly
enclosed” the land at issue and that the fence is not a casual fence.  See
McDonald v. Weinacht, 465 S.W.2d 136, 141-43 (Tex. 1971).  Because the
Huttons did not present such evidence, they claim there is an exception to the
requirement of a designed enclosure when the claimant proves sufficient
non-grazing use of the disputed land such that the true owner would have notice
of the hostile claim.  They cite Perkins v. McGehee, 133 S.W.3d 287, 292
(Tex. App.—Fort Worth 2004, no pet.); however,  there was virtually no evidence
of non-grazing use of the land except for the Huttons’ testimony that they used
the railroad right-of-way road.  When asked what other basis the Huttons had
for claiming adverse possession, other than the grazing of livestock, Gary
Hutton answered, “The right of egress and entrance to the property.”

Perkins
is easily distinguishable because the fence in that case was not a casual fence:
 the ranch manager for the northern tract had used the property to graze cattle
and had cleared brush and planted grass in the disputed area.  The Perkins
court found that the use of the tract by the McGehees and their predecessors had
been adverse, hostile, and exclusive to anyone else for a period of ten years. 
133 S.W.3d at 292-93.

The
Huttons did not present evidence of non-grazing use of the claimed area “such
that the true owner would have notice of their hostile claim.”  See Treviño
v. Treviño, 64 S.W.3d 166, 172 (Tex. App.—San Antonio 2001, no pet.). 
As stated, the Huttons admitted that they had not enclosed the claimed area.  The
Huttons were asked by Interrogatory No. 4 to list all non-grazing uses made of
the disputed one-half acre, more or less, that they contended would establish
their claim of adverse possession.  Their answer was as follows:

            Answer:
The primary use of this small corner piece of land was for access to
Plaintiffs’ tract.  Having been fenced and is used by Plaintiffs primarily for
grazing of livestock, but also is used for access to larger tract for hunting
and fishing.

 

            Gary
Hutton described the disputed area as being so small that it would not support
a cow and that a cow could perhaps graze it for one day.  Therefore, any
grazing of the area by a cow was very intermittent and could not have been “continuous
grazing” for the ten-year period.  The Huttons’ grazing of livestock in the
disputed area and their hunters’ hunting in the small area would not have given
notice to anyone that the Huttons were claiming adverse possession of the small
tract.  The fact that their hunters also used the gate on the Reids’ property
to get to the boundary gate between the two tracts to hunt on Huttons’ property
from time to time also did not constitute notice of the Huttons’ claim.  

The
same is true of the Huttons’ testimony that they had used the railroad
right-of-way road from the time that they acquired their property.  This was a
trespass to try title case, not an easement case.  Use of the road was
insufficient non-grazing evidence to establish ownership of an area of the
Reids’ property.  

The
Huttons had the burden of proving that they had exclusive domination over the
claimed area for a period of at least ten years.  Susan Reid testified that
Gilbert gave her a key to the gate between Gilbert’s land and county road 358
and that Susan had used it several times.  Although Charles Hutton attempted to
claim that the Huttons’ use was exclusive, he admitted that there was a string
of locks on the Reid gate.

According
to Charles Hutton, the rock from the quarry on the Huttons’ tract was used in
the building of Lake Proctor in Comanche County.  Construction of Proctor Dam was
completed in 1963,[3]
over twenty years before the Huttons acquired their tract. Gary Hutton
described the railroad right-of-way as being a good all-weather road and
convenient for them to access their property when they received a lot of rain. 
Inferences are never indulged in that favor the adverse claimant.  Bywaters,
686 S.W.2d at 595.  However, it is a reasonable inference from the Huttons’
testimony that some predecessor of the Reids gave permission to a predecessor
of the Huttons to use the all-weather road and build the gate between the two
properties to allow the rock trucks to use the road.

The
Huttons repeatedly testified that they believed that they owned the claimed
area from the time of their purchase of their principal tract from the Hansens. 
Belief that they owned the area is insufficient.  The Texas Supreme Court made
it clear in Orsborn, 267 S.W.2d at 787-88, that there must be open or
visible acts manifesting an intention to claim the land adversely.  The acts of
the Huttons – use of the railroad right-of-way road, occasional grazing by one
cow, or an occasional hunter in the small area – were insufficient notice of an
actual and visible appropriation of real property.

Because
the Huttons testified that they always thought they owned the claimed area,
they cite Calfee v. Duke, 544 S.W.2d 640, 642 (Tex. 1976).  Calfee
is not inconsistent with the earlier Orsborn opinion by the Texas
Supreme Court.  Calfee did not involve the issue of “open or visible
acts” by the adverse possession claimant.  And the facts in Calfee were
quite different from the case now before us.  In Calfee, the land in
dispute (24.744 acres) was fenced together with 223.8 acres known as the
“Moorefield homestead.”  Calfee, 544 S.W.2d at 641.  Calfee acquired the
fenced area by deed in 1946.  That deed described the conveyed land as
“embracing what has for many years been known as the Moorefield Homestead” and
also set forth a full metes and bounds description.  Id.

Calfee’s
mother was a daughter of J. H. Duke and may have been awarded an interest in
the 24 acres, along with other Duke heirs, by a judgment in 1935.  The Duke
heirs in Calfee did not contend that Calfee’s visible use and occupancy
of the 24 acres failed to satisfy limitation requirements.  Their contention
was that Calfee became a cotenant with them upon his father’s death (by
inheriting the interest his mother had in the 24 acres that she had previously
left to his father) and that he failed to give notice to the other Duke heirs
of his repudiation of their title.  The supreme court did not reach that issue. 
The court found that Calfee took possession of the fenced land in 1946 for
himself and without a cotenancy relation to anyone.  Id.  The court then
held that Calfee had claimed everything inside the fence and that, coupled
“with his actual and visible possession and use,” satisfied the adverse
possession requirements of the statute before Calfee’s father died in late 1956. 
Id. at 642.    

The
Huttons argue that the Reids were given notice of the Huttons’ claim in the title
policy issued to the Reids.  The title policy excluded any loss from “any
rights of the public or owners of [the] adjoining tract to use” the gravel drive
from county road 358 to the property adjoining the west side of the Reids’
tract “as depicted on plat of survey . . . dated April 19, 2005.”  The Reids
acquired their tract by deed dated April 29, 2005, from Gilbert.  The title
policy gave notice to the Reids that the Huttons may have had an easement to
use the railroad right-of-way road; it did not give notice that the Huttons
claimed ownership of an entire area.  But even if we assume that the title
policy gave notice to the Reids of the Huttons’ adverse possession claim to an
area, it is not helpful because the Huttons had to show that they gave notice
by acts over a ten-year period that included the time that the Gilberts owned
the land.  The title policy to the Reids gave no notice to the Gilberts of an
adverse possession claim by the Huttons.

The
Huttons failed to set forth an accurate description of the claimed area.  The
acts of the Huttons were insufficient notice of an actual and visible
appropriation of real property.  And, the unconditional offer by Gary Hutton to
buy the area was an acknowledgment of title in the Reids.  R. W. Wier Lumber
Co. v. Eaves, 296 S.W. 481 (Tex. Comm’n App. 1927); Houston Oil Co. of
Texas v. Pullen, 272 S.W. 439 (Tex. Comm’n App. 1925); Flowers v.
Sun NLF Ltd. Partnership, No. 08-00-00418-CV, 2002 WL 1938652 (Tex. App.—El
Paso 2002, no pet.) (not designated for publication); Wolgamot v. Corley,
523 S.W.2d 491 (Tex. Civ. App.—Waco 1975, writ ref. n.r.e.).

In
response to the Reids’ request for admissions, the Huttons admitted they had
offered to purchase the area from the Reids.  At trial, Gary Hutton admitted
again that he offered to buy the area and to pay all the costs.  However, Gary’s
counsel subsequently asked if Gary made the offer to purchase the land or to
“buy peace,” and Gary responded that his offer was “really” to buy peace.  That
answer was obviously an attempt to negate the Huttons’ admission (and Gary’s
admission) and to characterize his offer to purchase the area as not being a
recognition of the Reids’ ownership.  See Meaders v. Moore, 132 S.W.2d
256 (Tex. App. 1939).  But see Singleton v. Sw. Settlement &
Dev. Corp., 322 S.W.2d 677 (Tex. Civ. App.—Beaumont 1959, no writ) (possession
was not adverse, despite claimant’s assertion that, in making the offer, he had
merely been trying to buy peace).  

 
We recognize that the Huttons’ offer to purchase the area from the Reids came
after the ten-year period asserted by the Huttons.  An acknowledgment of title
in another made after the limitation period has been completed does not have
the effect of destroying a completed limitation title, but it is evidence
tending to show that the possession was not adverse.  Bruni v. Vidaurri,
166 S.W.2d 81, 88 (Tex. 1942); Peters v. Gillund, 186 S.W.2d 1019,
1020 (Tex. Civ. App.—Galveston 1945, writ ref’d w.o.m.).  Here there was not a
completed limitation title because of the lack of notice to the Gilberts and
the Reids and the failure to meet the requirement of defining the claimed area.
 The Huttons’ offer to purchase the area, coupled with their failure to tell
the Reids that they claimed ownership of the area, established that their
possession was not adverse.

Issues
2, 4, and 5 of the Reids are sustained.  We need not discuss the Reids’
remaining two issues.

This Court’s Ruling

            The
judgment of the trial court is reversed and judgment is rendered for the Reids.

            

                                    

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

 

August 18, 2011

Panel consists of:  Wright, C.J.,

McCall, J., and Kalenak,
J.









                [1]There is a discussion of a gate to the Reids’ property
in pages 32 and 33 of the record, but we are unable to tell from the record
where that gate was located.





[2]It appears from the title opinion dated January 22,
1985, from Turner, Seaberry & Warford, that the middle of the south side of
the Huttons’ property would be between the southeast quarter of section 22 and
the southwest quarter of section 19.

 





                [3]U.S.
Army Corps of Engineers, http://www.swf-wc.usace.army.mil/proctor/Information/History.asp,
search “History of Proctor Lake.”